## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| American Eagle Delaware Holding Company LLC, *et al.*,[1] | Case No. 22-_____ (___) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF TODD TOPLIFF, PRESIDENT OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Todd Topliff, hereby declare under penalty of perjury:

1.      I am the President of American Eagle Delaware Holding Company LLC and its subsidiaries that are debtors and debtors in possession (collectively, the **Debtors**"). I have served as the President of the Debtors since December 2020. In addition to my role with the Debtors, I have nearly a decade of experience working in the senior living industry.

2.      In my capacity as President, working with the Debtors' other advisors, I have provided long-term strategic planning, financial modeling, debt restructuring, asset disposition, and forecasting guidance. I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: American Eagle Delaware Holding Company LLC (4248), American Eagle Palmer Park LLC (d/b/a Lark Springs) (5908), American Eagle Tuskawilla LLC (d/b/a Palmetto Landing) (9489), American Eagle Leesburg AL LLC (d/b/a Vista Lake) (6258), American Eagle Brandon LLC (d/b/a Aldea Green) (6168), American Eagle Leesburg MC LLC (d/b/a Vista Lake) (7577), American Eagle Venice Island LLC (d/b/a Maris Pointe) (1695), American Eagle Titusville LLC (d/b/a Crescent Wood) (7210), American Eagle Island Lake LLC (d/b/a Cascade Heights) (1975), American Eagle Eau Gallie LLC (d/b/a Greenwood Place) (1483), American Eagle Owatonna AL LLC (d/b/a Timberdale Trace) (0555), American Eagle Hanceville LLC (d/b/a Monarch Place) (8173), American Eagle Ravenna LLC (d/b/a Vista Veranda) (9216), American Eagle Newark LLC (d/b/a Hearth Brook) (7125), American Eagle Kingston LLC (d/b/a Sycamore Springs) (4882), American Eagle Hendersonville LLC (d/b/a Red Cedar Glen) (3669), and American Eagle Pleasant Prairie LLC (d/b/a Robin Way) (9483). The Debtors' mailing address is American Eagle Delaware Holding Company LLC, c/o American Eagle Lifecare Corporation, 3819 Hawk Crest Rd., Ann Arbor, MI 48103.

authorized to submit this declaration (the "**Declaration**") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

3.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**") and in support of: (a) the Debtors' voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"); and (b) the relief that the Debtors have requested from the Court pursuant to the motions and pleadings (collectively, the "**First Day Pleadings**").

4.      The Debtors remain in possession of their assets and continue to operate their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.      No trustee, examiner, or committee has been appointed in these Chapter 11 Cases.

6.      As described more fully in Section IV, the Debtors have contemporaneously filed the following First Day Pleadings:

    a.      Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "**Joint Administration Motion**");

    b.      Motion of Debtors for Entry of an Order Authorizing Procedures to Maintain and Protect Confidential Resident Information (the "**Resident Confidentiality Motion**");

    c.      Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain and Administer their Refund Program and Practices, and (II) Honor Obligations Related Thereto (the "**Resident Refund Motion**");

    d.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash and Other Collateral, (II) Granting Adequate Protection, (III)

Scheduling a Final Hearing, and (IV) Granting Related Relief (the "**Cash Collateral Motion**");

e.    Motion of Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices (the "**Cash Management Motion**");

f.    Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Employee Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers (the "**Wages Motion**");

g.    Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "**Utilities Motion**");

h.    Motion Of Debtors for Entry of Interim and Final Orders (I) Authorizing Continuation of, and Payment Of Prepetition Obligations Incurred in the Ordinary Course Of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks To Honor And Process Checks And Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies From Giving Any Notice Of Termination Or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From The Automatic Stay, and (IV) Authorizing the Debtors to Continue to Honor Installment Plan and Brokerage Obligations (the "**Insurance Motion**");

i.    Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief (the "**Claims Agent Application**");

j.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Assume Restructuring Support Agreement and Granting Certain Related Relief (the "**RSA Assumption Motion**"); and

k.    Motion of Debtors for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs (the "**Schedules Extension Motion**");

7.      The Debtors seek the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of the assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me by the Debtors' advisors, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

8.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

9.      To familiarize the Court with the Debtors and the relief the Debtors seek early in these Chapter 11 Cases, this Declaration is organized into four sections. Section I provides an introduction to the Debtors and detailed information on the Debtors' corporate history and business operations. Section II provides an overview of the Debtors' prepetition capital structure. Section III describes the circumstances leading to the commencement of these Chapter 11 Cases, the Debtors' efforts to negotiate agreements with key constituents and the objectives of these Chapter 11 Cases. Section IV sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with these Chapter 11 Cases, which the Debtors believe are critical to administering these Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates. With respect to Section IV of this declaration, capitalized terms not otherwise defined therein shall have the same meanings as defined in the relevant First Day Pleading being discussed.

## I.      Overview of the Debtors' Business

10.     The Debtors are non-profit providers of senior living services across the country, providing care on a daily basis to approximately 1,000 residents. The Debtors operate 15

4

residential senior care facilities located across the United States, from Colorado, Minnesota, Wisconsin, and Ohio to Alabama, Tennessee, and Florida (collectively, the "**Facilities**" and each, a "**Facility**"). The Facilities provide residents with multiple opportunities for social and intellectual engagement and other benefits during retirement living as well as other necessary healthcare services and offer a family-oriented culture and competitive price point to appeal to current residents and attract prospective residents.

11.     Senior living facilities have experienced significant challenges and financial distress in recent years due to the COVID-19 pandemic. While the economic disruption caused by COVID-19 was felt nearly universally across most industries, the senior living industry has been uniquely affected because elderly individuals are among those most vulnerable and susceptive to the devastating impact of the virus. The Debtors faced increasing financial pressure caused by, among other things, declining census while experiencing exponential increases in labor costs and other COVID-related operating expenses. Moreover, the pandemic placed unprecedented stress on the sales and marketing efforts of the Facilities.

12.     As set forth in detail below, following the onset of the pandemic, to protect the health and safety of the residents and to meet federal, State, and local regulatory mandates, additional staffing hours were needed to conduct greatly enhanced infection control and resident care compliance. Though occupancy declined, Debtors were unable to reduce staffing levels and experienced higher staffing costs related to overtime, hazard payments due to COVID-19 outbreaks, and additional payments made to staff covering labor shortages. Additionally, equipment and supplies costs also increased due to additional purchases of infection control and personal protective equipment and supplies, including increased dietary costs associated with

purchasing food containers and personally delivering food to resident rooms. All of these factors have combined to negatively impact the Debtors' operations.

13.     The Debtors seek chapter 11 relief to accomplish several goals: (a) to ensure that the residents in the Facilities continue to experience and receive high-quality care while the Debtors implement their restructuring strategy; (b) to right-size their balance sheets by reducing the Debtors' prepetition secured debt by approximately $40 million; (c) to provide for approximately $28 million in new capital to be used for working capital and much needed capital expenditures; (d) to maximize the value of the Debtors' assets related to profitable Facilities; and (e) to enable the Debtors to transition certain of their underperforming Facilities to new operators, which efforts may include a sale pursuant to Bankruptcy Code section 363(f).

### A.     Corporate History and Business Operations

14.     The Debtors were formed in 2018 when American Eagle Delaware Holdings Company LLC and its subsidiaries purchased 16 senior living communities and related assets from Brookdale Senior Living Inc. in a move to expand their network of senior care facilities across the United States. The Debtors were organized and thereafter operated exclusively for public charitable uses and purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Specifically, the Debtors' charitable purposes include acquiring, owning, maintaining, and operating senior living facilities and providing healthcare and residential care to the elderly and infirm.

15.     The Facilities offer their residents a continuum of care in a community setting, providing living accommodations and related healthcare and support services to seniors. The Facilities are located across seven states and are comprised of 362 independent living apartments, 641 assisted living units, and 192 memory care units. Depending on location, the Facilities also contain dining rooms and lounges, libraries, beauty parlors, and other common spaces.

16.    As of December 31, 2021, the Debtors had the following occupancy rates:

|  | Census | Capacity | Occupancy Rate |
|---|---|---|---|
| Independent Living Units | 294 | 362 | 81.2% |
| Assisted Living Units | 526 | 641 | 82.1% |
| Memory Care Units | 153 | 192 | 79.7% |
| **Total** | **973** | **1,195** | **81.4%** |

17.    While many other senior living facilities receive large revenue streams from resident entrance fees, deposits, and skilled care reimbursements, the Debtors' model does not include such fees, deposits, and skilled care reimbursements. Instead, the Debtors receive revenue primarily from private paying residents and Medicaid reimbursements. The Debtors use the revenue received from resident receipts to fund daily operations and service their debt obligations.

18.    The Debtors contract with Greenbrier Senior Living, LLC ("**Greenbrier**"), a third-party management company, to run the Facilities' day-to-day operations. Under Greenbrier's management agreements with the Facilities, Greenbrier's responsibilities include managing, among other things, sales and marketing, clinical care, accounting, billing and collections, accounts payable, staffing, human resources, and compliance with applicable state regulations governing residential senior care facilities. In exchange for such services, Greenbrier's management fee was set at 4.5% of the gross monthly operating revenues of the Facilities for the first 12 months under the management agreements, 4.75% of the gross monthly operating revenues of the Facilities for the second 12 months under the management agreements, and 5.0% thereafter beginning in January 2021. To date, Greenbrier has deferred approximately $750,000 of its management fees in order to support the Facilities' operations and improve cashflow. In accordance with the Forbearance Agreement (defined below), Greenbrier has reduced its management fee paid to the amount of 4.75% of the gross monthly operating revenues of the Facilities while the Debtors have been under forbearance.

80804185.15

19. The Debtors also contract with Senior Housing Asset Resources LLC (the "**Asset Manager**"), an asset management subsidiary of Debtors' parent company, non-debtor American Eagle Lifecare Corporation. The Asset Manager provides operational oversight of Greenbrier, tracks compliance with reporting requirements under the Bond Documents, and performs additional duties in collaboration with Greenbrier. Such duties include monthly financial and operational review calls with Greenbrier, review of annual budgets, and recurring onsite visits to the Facilities to meet with staff and residents, and to evaluate the properties' physical condition and discuss maintenance projects and capital expenditures. The Asset Manager is also involved in the planning and execution of such maintenance and capital projects. Under the asset management agreement, the Asset Manager is compensated a fee equal to 1.0% of total gross operating revenues of the Facilities. The fee is paid on a monthly basis, however, the Asset Manager has deferred its fee while under forbearance.

20. Under the management of Greenbrier, the Debtors employ approximately 598 employees, including nurses, nursing assistants, other caregivers, dietary workers, housekeepers, maintenance workers, and administrative personnel. Due to COVID-19, the Debtors experienced unprecedented labor shortages across their Facilities, and as a result, the Debtors were forced to turn to staffing agencies to supplement their workforce, pay additional hazard pay during COVID-19 outbreaks, and offer sign-on bonuses and overtime and increase wages to help staff the Facilities and provide care to their residents. Similar to other senior living providers, the Debtors continue to combat labor shortages and employee retention issues due to, among other things, increased COVID-19 positivity rates among their current employees, vaccine mandates, and competition from other industries for the Debtors' workforce.

### B.    Business Operations

### (1)    Financial Performance

21.    In fiscal year 2020, the Debtors recognized total operating revenue of $51,291,552 and net operating income of $11,030,111, excluding COVID-19 and restructuring fees. In the 2021 fiscal year-to-date through November, the Debtors recognized total operating revenue of $40,792,497 and net operating income of $5,172,298.

### (2)    Corporate Governance

22.    The Debtors are governed by their respective Board of Managers, which is comprised of me, acting as the sole manager for each of the Debtors. Non-debtor American Eagle Lifecare Corporation, a Tennessee non-profit corporation that was established in 2002, is the sole member of American Eagle Delaware Holding Company LLC ("**Holdings**"). Debtor Holdings, a Delaware limited liability company, is the sole member of all of the other Debtors. A copy of the corporate organizational structure is attached hereto as Exhibit A.

### (3)    Regulatory Authorities

23.    Certain aspects of the Debtors' operations are subject to regulation by the various state and federal agencies. As detailed above, the Debtors operate in seven states and are regulated by the following licensing agencies: Agency for Healthcare Administration (Florida), Minnesota Department of Health, Tennessee Department of Health, Ohio Department of Health, Colorado Department of Public Health and Environment, Wisconsin Departments of Health Services, and the Alabama State Board of Health.

## II.    Prepetition Capital Structure

24.    As of the Petition Date, the Debtors owe creditors a total of approximately $252,942,285 consisting of secured bond obligations and unsecured obligations, including accrued interest as of the Petition Date (collectively, the "**Debt Obligations**").

A.       **Series 2018 Bond Obligations**

25.       To finance the costs of the original acquisition of the Facilities, Capital Trust Agency, a public agency entity organized under the laws of the State of Florida (the "**Issuer**") issued its Senior Living Revenue Bonds (American Eagle Portfolio Project) Series 2018 in the initial aggregate principal amount of $219,415,000, pursuant to a Trust Indenture dated as of December 1, 2018 (the "**Trust Indenture**") by and between the Issuer and UMB Bank, N.A., as Bond Trustee (the "**Bond Trustee**"), and consisting of: (a) $143,125,000 Series 2018A-1 Bonds (the "**Series 2018A-1 Bonds**"), (b) $20,500,000 Taxable Series 2018A-2 Bonds (the "**Series 2018A-2 Bonds**", together with the Series 2018A-1 Bonds, the "**Series 2018A Bonds**"), (c) $33,960,000 Second Tier Series 2018B Bonds (the "**Series 2018B Bonds**"), and (d) $21,830,000 Third Tier Series 2018C Bonds (the "**Series 2018C Bonds**" and, together with the Series 2018A Bonds and the Series 2018B Bonds, the "**Series 2018 Bonds**").

26.       The Issuer loaned the proceeds of the Series 2018 Bonds pursuant to a Loan Agreement dated as of December 1, 2018 between the Issuer, Holdings, as Borrower and Obligated Group Representative, and the Bond Trustee (together with all supplements, amendments and modifications thereto, the "**Loan Agreement**"). The proceeds of the Series 2018 Bonds were used to (i) finance a portion of the cost of the acquisition of the Facilities, (ii) establish separate debt service reserve funds for the Series 2018B Bonds and the Series 2018C Bonds, and (iii) pay a portion of the costs of issuance of the Series 2018 Bonds.

27.       The Debtors and UMB Bank, N.A., as Master Trustee (the "**Master Trustee**" and, in combination with its role as Bond Trustee, the "**Trustee**") also entered into that certain Master Trust Indenture dated as of December 1, 2018 (together with all supplements, amendments and modifications thereto, the "**Master Indenture**").

10

28.     In connection with the issuance of the Bonds, the Debtors made those certain promissory notes, executed and delivered under the Master Indenture, to evidence the obligation to repay the loan made pursuant to the Loan Agreement (collectively, the "**Series 2018 Obligations**") in the form of: (i) the Senior Series 2018A-1 Note dated December 1, 2018 (the "**Series 2018A-1 Master Note**"); (ii) the Senior Series 2018A-2 Note dated December 1, 2018 (the "**Series 2018A-2 Master Note**" and together with the Series 2018A-1 Master Note, the "**Series 2018A Master Notes**"); (iii) the Second Tier Series 2018B Note dated December 1, 2018 (the "**Series 2018B Master Note**"); (iv) the Third Tier Series 2018C Note dated December 1, 2018 (the "**Series 2018C Master Note**" and collectively with the Series 2018A Master Notes and the Series 2018B Master Note, the "**Series 2018 Master Notes**"). Each Series 2018 Master Note was made by Holdings in favor of the Issuer and was assigned by the Issuer to the Bond Trustee.

29.     The Series 2018 Bonds, the Trust Indenture, the Loan Agreement, the Master Indenture, the Series 2018 Master Notes, the Mortgages (as defined in the Master Indenture), and each other document or agreement delivered as security for, or in respect to, the Series 2018 Bonds, the Series 2018 Master Notes, and the Master Indenture are herein collectively referred to as the "**Bond Financing Documents**".

30.     To secure the Series 2018 Obligations, the Debtors granted the Trustee security interests in and liens on (collectively, the "**Prepetition Liens**") all of the collateral as fully described in the Bond Financing Documents consisting of substantially all of each Debtor's assets and property including, without limitation, all Project Revenues, accounts, deposit accounts, money and investment property of the Debtors and the proceeds thereof and all Mortgaged Property as evidenced by the Mortgages (each as defined in the Master Indenture) (collectively, the "**Prepetition Collateral**").

31.     As of the Petition Date, the Debtors were indebted and liable under the Bond Financing Documents (a) in the aggregate principal amount of $215,525,000, plus (b) accrued and unpaid interest of $19,153,481.85 with respect thereto and any additional fees, costs, premiums, expenses (including any Trustee's fees and expenses, which includes expenses of the Trustee's attorneys, financial advisors, and other professionals), reimbursement obligations, indemnification obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations owing under or in connection with the Bond Financing Documents (clauses (a) and (b) together, the "**Prepetition Secured Obligations**").

32.     Pursuant to the Master Indenture, each Obligated Group Member[2] granted to the Master Trustee a security interest in its Project Revenues (as defined in the Master Indenture), accounts, deposit accounts, money and investment property and the proceeds thereof to the extent not otherwise granted under the Bond Indenture and constituting part of the Trust Estate.

33.     The obligations of the Obligated Group Members under the Master Indenture are further secured by substantially all of the real and personal property of each property owner Debtor pursuant to the following instruments (each, a "**Mortgages**"): (i) the Mortgage, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018 given by Hanceville and Holdings in favor of the Master Trustee; (ii) the Deed of Trust dated as of December 1, 2018 given by Palmer Park and Holdings to The Public Trustee of El Paso County, State of Colorado, as

---

[2] For clarity, the Obligated Group Members are Debtors American Eagle Pleasant Prairie LLC ("**Pleasant Prairie**"), American Eagle Hanceville LLC ("**Hanceville**"), American Eagle Palmer Park LLC ("**Palmer Park**"), American Eagle Leesburg AL LLC ("**Leesburg AL**"), American Eagle Leesburg MC LLC ("**Leesburg MC**"), American Eagle Venice Island LLC ("**Venice Island**"), American Eagle Titusville LLC ("**Titusville**"), American Eagle Eau Gallie LLC ("**Eau Gallie**"), American Eagle Island Lake LLC ("**Island Lake**"), American Eagle Tuskawilla, LLC ("**Tuskawilla**"), American Eagle Brandon LLC ("**Brandon**"), American Eagle Owatonna AL LLC ("**Owatonna**"), American Eagle Newark LLC ("**Newark**"), American Eagle Ravenna LLC ("**Ravenna**"), American Eagle Kingston LLC ("**Kingston**"), and American Eagle Hendersonville LLC ("**Hendersonville**"). American Eagle Castle Hills LLC withdrew from the Obligated Group on January, 4, 2021.

trustee for the benefit of the Master Trustee; (iii) the Mortgage, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018 given by Leesburg AL, Leesburg MC, Venice Island, Titusville, Eau Gallie, Tuskawilla, Island Lake, Brandon, and Holdings in favor of the Master Trustee; (iv) the Mortgage, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018, given by Owatonna and Holdings in favor of the Master Trustee; (v) the Open-End Mortgage, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018, given by Newark, Ravenna, and Holdings in favor of the Master Trustee; (vi) the Deed of Trust, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018 given by Kingston, Hendersonville and Holdings to D. Matthew Foster, as trustee for the benefit of the Master Trustee; and (vii) the Mortgage, Assignment of Rents and Leases, and Security Agreement dated as of December 1, 2018 given by Pleasant Prairie and Holdings in favor of the Master Trustee.

34.     The obligations of the Obligated Group Members under the Master Indenture are further secured by the Collateral Assignment of Management Agreement and Consent of Manager dated as of December 1, 2018, among each property owner Debtor, the Master Trustee, and Greenbrier and the Collateral Assignment of Permits and Licenses dated as of December 1, 2018 among each property owner Debtor and the Master Trustee (together, the "**Collateral Assignments**").

35.     Each property owner Debtor also entered into a Land Use Restriction Agreement dated as of December 1, 2018 with the Issuer, Holdings, and the Bond Trustee with respect to the real property owned by it, and Holdings entered into a Tax Regulatory Agreement and No-Arbitrage Certificate dated December 20, 2018 (the "**Tax Agreement**") with the Issuer and the Bond Trustee, pursuant to which agreements Holdings and each Property Owner Debtor agreed to

comply with certain requirements to preserve the exclusion of interest on the Series 2018A-1 Bonds, the Series 2018B Bonds, and the Series 2018C Bonds on a tax-exempt basis from the gross income of their owners under Section 103(a) of the Internal Revenue Code, as amended.

36.     Following the onset of the COVID-19 pandemic, Holdings stopped making monthly interest and principal payments with respect to the Series 2018 Bonds to preserve cash needed for operations. The first missed payment occurred on April 15, 2020. Upon information and belief, through the Petition Date, the Trustee has withdrawn $1,095,082.89 from the Second Tier Bonds Debt Service Reserve Fund to pay interest on the Series 2018B Bonds as it became due, such that the balance in the Second Tier Bonds Debt Service Reserve Fund is now negligible. Upon information and belief, through the Petition Date, the Trustee has withdrawn $1,116,169.22 from the Third Tier Bonds Debt Service Reserve Fund to pay interest on the Series 2018C Bonds as they became due, such that the balance in the Third Tier Bonds Debt Service Reserve Fund is now negligible. Upon information and belief, as of the Petition Date, the Trustee holds approximately $2 million in a Workout Administration Account/Debt Service Reserve Fund in trust for the benefit of the holders of the Series 2018A Bonds.[3] The remaining balances of the trustee-held funds established pursuant to the Bond Indenture are negligible.

37.     As of the Petition Date, the amounts due and owing by the Debtors with respect to the Series 2018 Bonds are as follows: (i) unpaid principal on the Series 2018A-1 Bonds in the amount of $140,760,000 and accrued but unpaid interest on the Series 2018A-1 Bonds in the amount of $12,543,701.90; (ii) unpaid principal on the Series 2018A-2 Bonds in the amount of $19,160,000 and accrued but unpaid interest on the Series 2018A-2 Bonds in the amount of

---

[3] Pursuant to the Forbearance Agreements dated July 1, 2020 and March 9, 2021, the Debtors made certain partial payments to the Trustee with respect to the Series 2018A Bonds.  Those prepetition forbearance payments were allocated to the Workout Administration Account/Debt Service Reserve Fund for the benefit of the holders of the Series 2018A Bonds.

$1,478,737,12; (iii) unpaid principal on the Series 2018B Bonds in the amount of $33,815,000 and accrued but unpaid interest on the Series 2018B Bonds in the amount of $2,304,198.06; (iv) unpaid principal on the Series 2018C Bonds in the amount of $21,790,000 and accrued but unpaid interest on the Series 2018C Bonds in the amount of $2,826,844.77; and (v) accrued and unpaid fees and expenses of the Trustee and its professionals incurred through the Petition Date (such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claims).

38.     Additionally, a portion of the costs of the 2018 acquisition of the Facilities were financed through a $10,000,000 Deferred Purchase Price Promissory Note dated December 20, 2018 (the "**Seller Note**"), made by each property owner Debtor in favor of Brookdale Senior Living Communities, Inc. ("**Brookdale**"). The Seller Note was authenticated by the Master Trustee as an Obligation issued under the Master Indenture and, as such, is entitled to the benefits and security of the Master Indenture, but is an Additional Subordinate Obligation (as defined in the Master Indenture). Accordingly, the Seller Note and any costs associated therewith, are subordinate to the Series 2018 Master Notes. By its terms, the obligations of each property owner Debtor with respect to principal of and accrued interest on the Seller Note are subordinate and junior in right of payment to all obligations secured by the Bond Indenture and the Loan Agreement, including the Bonds, and payable only from Excess Surplus Fund Amounts (as defined in the Bond Indenture), if any, transferred from the Surplus Fund in accordance with the Bond Indenture.  As of the Petition Date, $10,000,000 in principal amount and $1,688,021.90 in accrued interest is due and owing by the property owner Debtors on the Seller Note.

**B.     Unsecured Debt**

39.     As of the Petition Date, the Debtors estimate that general unsecured creditors are currently owed approximately $2,100,000. This group includes non-insider trade creditors and vendors.

III.    **Events Leading to Chapter 11 Filing**

A.    **Causes of Financial Distress**

40.    The Debtors' financial distress is due to several factors, including COVID-19 stress on the senior living community and liquidity constraints. As set forth in more detail above, the Debtors financed the acquisition of the Facilities primarily through the issuance of the Series 2018 Bonds in the original principal amount of $219,415,000. Moreover, the healthcare industry as a whole, and retirement communities in particular, have faced financial difficulties during recent years. The dramatic changes in the healthcare market over the last decade have impacted the Debtors' operations.

41.    Prior to the onset of the COVID-19 pandemic, the Debtors had been experiencing financial difficulties that necessitated engaging a financial consultant. The Debtors engaged Vinca Group L.L.C. ("**Vinca Group**") to conduct a review of the Facilities' operations, forecast cash flow available for debt service through 2021, and make recommendations to assist the Debtors in restoring compliance with the days cash on hand requirement under the Bond Financing Documents. The Vinca Group issued its report on February 14, 2020. The Debtors operated with regard to the Vinca Group's report and followed its recommendation as was feasible.

42.    The COVID-19 pandemic in the first quarter of 2020 severely disrupted most industries in our nation, and the senior living industry has been hit especially hard.[4] The residents

---

[4] In March 2020, the World Health Organization declared COVID-19 to be a pandemic. The extent to which COVID-19 has affected all aspects of life cannot be understated, but older adults are acutely susceptible to its effects. The Centers for Disease Control and Prevention ("CDC") has found that:

> Older adults are more likely to get very sick from COVID-19. Getting very sick means that older adults with COVID-19 might need hospitalization, intensive care, or a ventilator to help them breathe, or they might even die. The risk increases for people in their 50s and increases in 60s, 70s, and 80s. People 85 and older are the most likely to get very sick.

Of the more than 600,000 deaths attributed to COVID-19 in the United States, it is estimated that 92% of all deaths occurred among those aged 50 or older and 31% are related to residents and employees associated with senior living.

that the Debtors care for are the population at the greatest risk of this virus, and the Debtors are committed to the health and safety of all of their residents and staff.

43.     The Debtors incurred significant costs as a direct result of the COVID-19 protocols and procedures implemented. These protocols and procedures, which have been essential to the continued health and safety of the Debtors' residents and staff, include:

- the constant use of personal protective equipment,

- the need to deliver every meal to resident rooms versus communal dining,

- providing alternative socialization during times of quarantine,

- increases in supply costs due to national shortages,

- additional staffing hours to conduct greatly enhanced infection control and resident care compliance measures including but not limited to:

   o   taking the temperatures and pulse oxygen levels of all residents three times per day;

   o   taking temperatures and pulse oxygen levels of all staff upon the beginning of each shift;

   o   disinfecting all common areas a minimum of twice daily and high touch areas more often;

   o   increased training of all associates;

   o   isolating residents to rooms requiring in room meals services and individualized socialization and care giving to residents; and

   o   strictly limiting and managing essential visitor and vendor visits.

---

See THE NEW YORK TIMES, *Nearly One-Third of U.S. Coronavirus Deaths Are Linked to Nursing Homes*, https://www.nytimes.com/interactive/2020/us/coronavirus-nursing-homes.html (last visited July 23, 2021).

80804185.15

- hazard pay provided to staff;

- contracting with sanitization companies to provide disinfectant fogging during periods of COVID-19 outbreaks;

- procurement of COVID-19 testing kits and ongoing testing of residents and staff; and

- procurement of special disinfecting equipment, including UV lighting and HEPA towers.

44. In addition to increased expenses, substantial occupancy declines throughout 2020 caused reductions in revenue. These occupancy declines were largely due to natural attrition, but as residents moved out, the Facilities struggled to replace them with new residents because of a material reduction in marketing leads and facility tours provided to prospective residents relative to pre-pandemic levels. Occupancy at the Facilities had been increasing since the Debtors acquired the Facilities, but the onset of the pandemic led to a substantial decline as demonstrated by the Occupancy Chart below. Further, the rise of the variants of COVID-19 halted recovery of the Facilities' occupancy rates demonstrated in the first half of 2021.



45.    Further impacting revenue, the Debtors have had to deal with multiple complexities and challenges created by the pandemic including but not limited to:

- medical professionals discouraging residents and families from moving to senior living facilities;

- hospitals and nursing homes not allowing in-person assessments due to essential visitor restrictions;

- risks with admitting residents coming from hospitals, nursing homes, or rehab centers that have cases of COVID-19;

- shelter in place orders;

- state and local regulations deterring any current move-ins;

- tours being limited to "virtual" and not in person; and

- an overall desire for residents to stay at home and a general public aversion to senior living facilities during the COVID-19 crisis.

46.     Additionally, the Debtors' management has closely followed the recommendations of the Centers for Disease Control and Prevention and the Centers for Medicare and Medicaid Services. At the onset of the pandemic, management instituted a 14-day quarantine of all new admissions to independent and assisted living and time-intensive disinfecting measures were required for resident furniture and belongings. Currently, a 5-day quarantine period is required of all unvaccinated new admissions.

47.     In light of the significant cost increases and other challenges associated with the pandemic, in March 2020, the Debtors determined that they could not make timely debt service payments on the Bonds while also protecting the health and safety of their residents and staff. The Debtors proactively reached out to the Bond Trustee in March 2020 to apprise of the situation and the Debtors' determination that they could not make payments on the Series 2018 Bonds while ensuring the health and safety of their residents and staff due to the financial strain of the COVID-19 pandemic. The Debtors held calls with investors on March 16, 2020, April 13, 2020, August 25, 2020, and November 13, 2020 to discuss these issues as well as the Debtors' efforts during the pandemic.

**B.     Restructuring Efforts**

48.     On July 30, 2020, the Debtors and the Trustee entered into that certain Forbearance Agreement (as subsequently amended or modified, the "**Forbearance Agreement**"), pursuant to which the Trustee, at the direction of holders of a majority of the aggregate outstanding principal amount of the Series 2018A Bonds, agreed to forbear exercising its rights under the Bond Documents with respect to the Specified Defaults (as defined in the Forbearance Agreement) through and including December 31, 2020. The forbearance termination date was subsequently

extended through and including January 14, 2021 pursuant to that certain First Extension to Forbearance Agreement dated May 17, 2021; that certain Second Extension to Forbearance Agreement dated August 3, 2021; that certain Third Extension to Forbearance Agreement dated September 15, 2021; that certain Fourth Extension to Forbearance Agreement dated November 1, 2021; and that certain Fifth Extension to Forbearance Agreement dated December 13, 2021.

49.     Pursuant to the terms of the Forbearance Agreement, the Debtors were required to, among other things: (i) pay to the Bond Trustee $2,895,760 on account of amounts owing on the Bonds on the date of the Forbearance Agreement; (ii) pay to the Bond Trustee $432,772.97 that was in the Insurance and Tax Escrow Fund (as defined in the Bond Indenture) established under the Bond Indenture on the date of the Forbearance Agreement; (iii) recommence depositing all Project Revenues into the Revenue Fund (each as defined in the Bond Indenture) as required by the Bond Indenture; (iv) adhere to an agreed-upon budget with certain permitted variances; (v) update the budget each month to add an additional four weeks such that the budget will always be a rolling 13-week budget, and (vi) under certain circumstances, pay to the Bond Trustee excess cash flows.

50.     Prior to the Petition Date, the Debtors marketed and sold the facility known as "Ventura Hills" located in San Antonio, Texas (the "**Ventura Hills Facility**"). The Ventura Hills Facility was owned by American Eagle Castle Hills LLC ("**Castle Hills**"). The purchase price for the Ventura Hills Facility was $2,750,000.00, subject to prorations and adjustments as provided in the Asset Purchase and Sale Agreement. The sale of the Ventura Hills Facility closed on or about January 1, 2021. Castle Hills was subsequently withdrawn from the Obligated Group. On February 24, 2021, the Bond Trustee used net proceeds of the sale and additional funds of Holdings to

redeem $2,365,000 in principal amount of the Series 2018A-1 Bonds, and $350,000 in principal amount of Series 2018A-2 Bonds.

51.    Also prior to the Petition Date, the Debtors retained a broker with significant experience in the marketing and sale of senior living facilities, Blueprint Healthcare Real Estate Advisors ("**Blueprint**") to conduct a broad marketing process for potential regional and national operators for the Debtors' Facility known as Vista Lake in Florida. As a result of a robust prepetition marketing process, the Debtors have identified a number of potential purchasers for Vista Lake. To maximize the value of Vista Lake, the Debtors propose to continue the sales process post-petition as they continue to negotiate with potential purchasers and develop strategies.

52.    Despite instituting many cost saving recommendations from the Debtors' advisors throughout 2020 and 2021, the Debtors have continued to face financial pressure. As a result, the Debtors recognized the need to seek relief by filing petitions for relief under Chapter 11 of the Bankruptcy Code.

53.    In order to maximize the value of the Debtors' assets, restructure the Debtors' prepetition capital structure, ensure sufficient liquidity to support the Debtors' ongoing business operations, and continue to provide quality care to the residents of the Facilities, the Debtors have negotiated with the Trustee and the holders of a majority in aggregate principal amount of outstanding Series 2018A Bonds (the "**Controlling Holders**") a consensual Chapter 11 Plan of Reorganization (the "**Plan**"), which Plan has been filed contemporaneously herewith.  Among other things, the Plan provides for a reduction in the Debtors' prepetition outstanding secured indebtedness by approximately $40 million, to be accomplished pursuant to a mandatory exchange of the Series 2018 Bonds for certain new Series 2022 Bonds. Also, certain of the Controlling Holders have agreed to purchase new Series 2022A Bonds, the proceeds of which will be loaned

22

to the Debtors and used to fund working capital (approximately $6.44 million) and capital expenditures (approximately $15.23 million) over the four years following the Debtors' emergence from bankruptcy.

## IV.    **First Day Pleadings**

54.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Pleadings. The Debtors request that each of the First Day Pleadings described below be granted, as they are critical to maintaining business operations with minimal disruption, protecting the Debtors' residents, and maximizing the value of the Debtors' estates.

### A.    **Joint Administration Motion**

55.    Pursuant to the Joint Administration Motion, the Debtors are requesting that these Chapter 11 Cases be jointly administered for procedural purposes. Joint administration of the chapter 11 cases will promote efficiency and will ease the administrative burden on this Court and all parties in interest. Because the Debtors' management, financial affairs, and operations are closely related, I anticipate that many of the motions, hearings, and orders in the bankruptcy proceedings will affect all of the Debtors. Joint administration also will reduce the volume of paper that otherwise would be filed with the Clerk of the Court because it will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders.

56.    I believe that parties in interest will not be harmed by the relief requested in the Joint Administration Motion; instead, I believe that parties in interest will benefit from the cost reductions associated with the joint administration of these Chapter 11 Cases. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of their estates, their creditors, and all other parties in interest. I also believe that the use of the proposed caption

as set forth in the Joint Administration Motion will eliminate cumbersome and potentially confusing procedures and ensure uniformity of pleading identification.

### B.      Resident Confidentiality Motion

57.      Pursuant to the Resident Confidentiality Motion, the Debtors seek entry of an order authorizing the implementation of procedures to protect confidential information of the Debtors' current and former residents. In the ordinary course of business, the Debtors have access to and receive certain health information and data relating to the current and former residents. I understand that the Debtors have the duty to list all such residents on the Debtors' mailing matrices and bankruptcy schedules in accordance with bankruptcy noticing procedures.

58.      In an effort to comply with both federal and state patient privacy statutes and regulations while also discharging the Debtors' duties as debtors in possession, the Debtors propose certain procedures to ensure resident confidentiality during the pendency of these Chapter 11 Cases. I believe that the relief requested in the Resident Confidentiality Motion appropriately balances the need to maintain confidential information under HIPAA with the need for adequate disclosure under the Bankruptcy Code and is appropriate under the circumstances.

### C.      Resident Refund Motion

59.      In the ordinary course of business, the Debtors make refunds to residents, including but not limited to, refunds due as a consequence of residents vacating the facility before the conclusion of their pre-paid residency period (the "**Refund Program**"). The Refund Program is aimed to enhance resident satisfaction and generate goodwill for the Debtors, ultimately allowing them to attract prospective residents and retain residents, who are considering whether the Debtors' procedures and policies are fair and equitable.

60.      Pursuant to the Resident Refund Motion, the Debtors respectfully request entry of an order authorizing the Debtors to (a) maintain, administer, and modify their Refund Program

24

and make payments to residents and/or their designees or to otherwise honor accrued prepetition obligations owed under their Refund Program (collectively, and as identified herein, the "**Refund Program Obligations**") and (b) continue, replace or modify any Refund Program in the ordinary course of business.

61.     The amount of the refunds due and owing vary month to month. At any given time, it is difficult to determine the amount of outstanding overpayments for which a refund check has not yet been issued. Moreover, some refund checks issued to residents or their designees before the Petition Date may not have been presented for payment or may not have cleared the Debtors' cash management system. Accordingly, some of these refunds may have not been honored and paid as of the Petition Date. While in 2021, the largest monthly refund was approximately $73,000, based on the impact that the current COVID-19 variant is having across the country, the Debtors have reason to believe that Refund Program Obligations may be materially higher during the first quarter of 2022 than in prior months. The Debtors therefore request the authority to continue to issue and pay the Refund Program Obligations to residents or their designees, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business. I believe that the Debtors' ability to maintain the Refund Program ensures the preservation of resident relationships, and considering the current landscape of senior living and for all of the reasons detailed herein, now is not the time to risk alienating current or prospective residents.

### D.     Cash Collateral Motion

62.     Pursuant to the Cash Collateral Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to use Cash Collateral, as defined in Bankruptcy Code section 363(a), of the Trustee; (ii) providing adequate protection to the Trustee on the terms set forth in the Interim Order (as defined in the Cash Collateral Motion); (iii) scheduling a final hearing on the

Cash Collateral Motion and approving the form and notice of notice thereof; and (iv) granting related relief.

63.     Based on the performance of the Debtors' business, among other things, the Debtors, in consultation with their professionals, determined that the Facilities could not support the Prepetition Secured Obligations. The Debtors, in consultation with their professionals, further determined that they would be unable to restructure the Prepetition Secured Obligations outside of these Chapter 11 Cases.

64.     The Debtors have an immediate and critical need for the use of Cash Collateral. Access to the use of Cash Collateral will allow the Debtors to continue operating, retain employees, and provide quality care to their residents, which the Debtors believe will preserve and maximize the value of the estates for the benefit of all parties in interest. The Debtors have determined that absent the use of Cash Collateral, the Debtors will be unable to continue (i) operations of their businesses, (ii) the reorganization of their assets, and (iii) the marketing and sales process of the facility known as "Vista Lake", which will irreparably harm the Debtors' estates, creditors, and residents. The Debtors' ongoing obligations include obligations to pay wages to employees and amounts due and owing to vendors. Prompt payment of these obligations is critical to the well-being of the residents of the Facilities.

65.     In exchange for the consensual use of Cash Collateral, the Debtors have agreed, to adequate protection in the form of, among other things, adequate protection liens, superpriority claims to protect the Trustee against any diminution in the value of its interests in the Prepetition Collateral, including Cash Collateral, resulting from the use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and payment of the Trustee's fees and expenses. The

requested relief further provides for the subordination of the Trustee's liens to the Carve-Out (as defined in the Interim Order).

66.     At this time, the Debtors do not contemplate the need for postpetition financing. Instead, the Debtors intend to operate their businesses solely on the use of the existing Cash Collateral. I believe that access to existing Cash Collateral will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to continue operating and continue their reorganization and sales processes. Without access to Cash Collateral, I believe the Debtors will face irreparable harm.

67.     Based on the foregoing, I believe that entry of the Cash Collateral Motion authorizing the use of Cash Collateral is necessary and appropriate.

**E.      Cash Management Motion**

68.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to continue to maintain and use the existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (b) granting the Debtors a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under the existing cash management system or other actions described herein; (c) authorizing, but not directing, the Debtors to continue to maintain and use the existing deposit practices notwithstanding the provisions of Bankruptcy Code section 345(b); and (d) authorizing the Debtors to pay ordinary course fees and service charges in connection with the maintenance of their existing cash management system. The Debtors also request that the Court authorize and direct all banks with which the Debtor maintains accounts to continue to maintain, service, and administer such accounts and authorize third-party administrators and providers to prepare and issue payments on behalf of the Debtor.

69.     The Debtors maintain an integrated cash management system (the "**Cash Management System**") to collect, transfer, and disburse funds generated by its operations. The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting functions and enables the Debtors to maintain their twenty-eight (28) Debtor-held bank accounts (the "**Debtor Bank Accounts**"). The Debtor Bank Accounts are maintained at Bank United and First Midwest Bank.

70.     Pursuant to the Bond Financing Documents, certain accounts are held by UMB Bank, N.A., in its capacity as Bond Trustee under the Trust Indenture (collectively, the "**Trustee-Held Accounts**"), and such accounts are maintained at UMB Bank, N.A. (in its capacity as a depository institution, "**UMB**" and, together with BankUnited and First Midwest Bank, the "**Banks**").  Except as expressly set forth in the Cash Management Motion with respect to the Revenue Account, which is the Trustee-Held Account with account number ending 9160.12 (the "**Revenue Account**" and, together with the Debtor Bank Accounts and any other bank accounts that the Debtors may open in the ordinary course of its business or in connection with the Chapter 11 Case, the "**Bank Accounts**"), the Debtors are not seeking authority to use the Trustee-Held Accounts pursuant thereto.[5]

71.     The Debtors maintain the Bank Accounts at BankUnited and First Midwest Bank (each a "**Bank**" and collectively, the "**Banks**"). Generally, the Bank Accounts fall into the following categories[6]:

a.     Community Deposit Accounts (First Midwest Bank and BankUnited);

b.     Central Deposit Accounts (First Midwest Bank and BankUnited);

---

[5] The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System.

[6] The Debtors maintain three additional inactive accounts through First Midwest Bank. Though these Bank Accounts are currently inactive, the Debtors intend to deposit the adequate assurance deposits proposed in the Utilities Motion into one of these Bank Accounts.

80804185.15

   c.    Revenue Account (UMB);

   d.    Operating Account (BankUnited);

   e.    Payroll Account (BankUnited)[7]; and

   f.    AP Account (BankUnited)[8].

72.    The Debtors' Cash Management System involves routine deposits into, withdrawals from, and transfers of funds between Bank Accounts by various means, including checks, wire transfers, and ACH transfers. On a daily basis, the Debtors process large numbers of transactions through their Cash Management System. At all times, the Debtors keep current and accurate records of all transactions processed through its Cash Management System and of its Bank Accounts.

73.    Given the nature of Debtors' business and their centralized Cash Management System, in the ordinary course of business, intercompany transactions (the "**Intercompany Transaction**s") among the Debtors are driven by cash and transfers and result in intercompany receivables and payables (the "**Intercompany Claims**"). The main Intercompany Transactions giving rise to Intercompany Claims are:

   a.    Receipts Activities; and

   b.    Disbursement Activities.

74.    Certain employees are able to utilize debit cards (the "**PEX Cards**") for small daily expenses incurred by the Facilities' on-site staff. There are approximately 15 outstanding PEX Cards with beginning monthly average balances totaling approximately $50,000 in the aggregate.

---

[7] Oasis, the Debtors' payroll processor, directly draws payroll disbursements out of the Payroll Account weekly to distribute payroll on Fridays. The majority of employees are paid via direct deposit, and there are less than twenty (20) employees who receive physical checks.

[8] The majority of Debtors' disbursements are made from the AP Account. In most instances, the Debtors have their external vendors set up through the online bill payment platform *bill.com* wherein invoices are processed and paid via *bill.com* from funds drawn from the AP Account. Other vendors are paid via ACH directly from the AP Account.

75.    The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Case and the goal of maximizing value for the benefit of all parties in interest. The Cash Management System is specifically designed for administering the Debtors' business, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management. To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and would disrupt the Debtors' ability to collect receivables from private payors and Medicaid. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address cash management requirements. For the aforementioned reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, the estate, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System, including maintenance of the existing Bank Accounts.

76.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**F.    Wages Motion**

77.    Pursuant to the Wages Motion, the Debtors seek authority to (i) pay certain prepetition wages, salaries, and other compensation; (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, severance practices, and employee benefit plans and

30

programs, as described below; (iii) reimburse Employees (as defined below) for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (iv) pay all related prepetition payroll taxes and other deductions; (v) honor worker's compensation obligations and related obligations; and (vi) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider.

78.    In connection with the operation of its business, the Debtors currently employ approximately 598 employees (together, the "**Employees**"), of which approximately 472 are full-time employees and 126 are part-time employees. The Employees consist of 62 employees that are paid a fixed salary and 536 employees that are paid on an hourly basis. All Employees are employed at the Facilities.

79.    The Employees are critical to the operation of the Debtors' business, and their value cannot be overstated, particularly in light of the hardships facing senior living communities during the COVID-19 pandemic. To a significant extent, the long-term prognosis of the Debtors' business, including ensuring the health and safety of their residents, depends on the Debtors' ability to attract and retain qualified personnel. The loss of certain Employees will impede the Debtors' business and seriously harm the ability to ensure the health and safety of residents and successfully implement their bankruptcy strategy.

80.    Any interruption in payment of prepetition employee-related obligations, including wages, bonuses, paid time-off, health and other benefits, and reimbursement of business expenses, will impose hardship on the Employees and is certain to jeopardize their continued performance during this critical time.  If the Debtors cannot assure their Employees that prepetition Employee

Obligations will be promptly paid, certain Employees will seek employment elsewhere. The loss of any Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases as it is well established that the senior care industry is facing its worst job loss among health care providers during the pandemic.[9]

81.     As noted above, the Debtors have approximately 598 Employees. In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. Approximately sixty-two (62) Employees are paid a fixed salary and approximately 536 are paid on an hourly basis.

82.     The Debtors utilize two payroll cycles, which are designated by Facility. The first payroll cycle consists of all of the Debtors' Employees that are employed at the Lark Springs, Vista Veranda, Sycamore Trace, Vista Lake, Palmetto Landing, Greenwood Place, Crescent Wood, Maris Pointe, Red Cedar Glen, Monarch Place, Robin Way, and Timberdale Trace Facilities (hereinafter, the "**First Payroll Cycle**"). The second payroll cycle consists of all of the Debtors' Employees that are employed at the Debtors' Aldea Green, Hearth Brook, and Cascade Heights Facilities (the "**Second Payroll Cycle**"). All Employees are paid on a bi-weekly basis a week in arrears, regardless of which payroll cycle they belong to; however, because the First Payroll Cycle and Second Payroll Cycle are paid in alternating weeks, the Debtors have weekly payroll obligations.

---

[9] See, e.g. American Health Care Association, *REPORT: Nursing Homes Down 221,000 Jobs Since Start of Pandemic* (Nov. 10, 2021), https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/REPORT-Nursing-Homes-Down-221,000-Jobs-Since-Start-Of-Pandemic.aspx; Kimberly Marselas, *Unmanifested inflation: Labor shortages may begin to improve — but at a price* (November 3, 2021), https://www.mcknights.com/news/unmanifested-inflation-labor-shortages-may-begin-to-improve-but-at-a-price/.

83.     The Debtors' average gross payroll obligation on account of the First Payroll Cycle is approximately $655,000.00. The Debtors' average gross payroll obligation on account of the Second Payroll Cycle is approximately $212,000.00. The last date that the First Payroll Cycle was compensated prior to the Petition Date was January 7, 2022. The last date that the Second Payroll Cycle was compensated prior to the Petition Date was January 14, 2022. The Debtors estimate that as of the Petition Date, approximately $655,000 has accrued and remains unpaid on account of the First Payroll Cycle, and approximately $106,000 has accrued and remains unpaid on account of the Second Payroll Cycle (collectively, the "**Employee Compensation Obligations**"). To the best of the Debtors' understanding, none of the Employees are owed more than $13,650 in accrued and unpaid general prepetition wages or salaries.

84.     The Debtors also regularly utilize the services of contract workers ("**Contractors**" and, together with the Employees, the "**Workforce**") to provide a variety of services. The Contractors are (i) either employed directly by, and have contracts directly with, the Debtors (the "**Direct Contractors**"), or (ii) employed by third party staffing agencies and outsourced to the Debtors (the "**Third Party Contractors**"). There are fifteen (15) Direct Contractors who serve as the executive directors of the Debtors' Facilities and manage all functional areas of the Facilities and ensure compliance with all current industry standards, regulations and guidelines. The Debtors spend approximately $30,000 per week on account of wages and compensation, excluding incentive payments, owed to the Direct Contractors. The Debtors also utilize the services of Third Party Contractors comprising of nurses, nursing assistants, and other temporary employees provided through various staffing agencies which provide critical supplemental staffing for the Facilities. These Third Party Contractors are necessary for the Debtors to provide a high level of

care for their residents, and to comply with staff requirements pursuant to federal and state regulations and requirements.

85.     Prior to the Petition Date, the staffing agencies invoiced the Debtors based upon the number of hours worked by the Third Party Contractors and, in turn, the staffing agencies pay the Third Party Contractors' wages and other amounts. As the COVID-19 pandemic continues, the Debtors expect that they may become even more dependent on staffing agencies to both address increased demand for services and to temporarily replace Employees. If the staffing agencies are unable or unwilling to provide the Debtors with the necessary Third Party Contractors, the Debtors will not have sufficient staff to support current resident occupancy levels, which obviously will severely and detrimentally impact the Debtors' business and ordinary operations. During 2021, the Debtors paid the staffing agencies as much as $40,000 per month in the aggregate across Facilities.

86.     The Contractors fill certain critical business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner. The Contractors are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contractors, it is highly likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations. And most importantly, there is a real risk to the health and safety of the residents if the Debtors are not able to depend on the Contractors. The Debtors would be irreparably harmed without the services of the Contractors because such parties play a critical role in the Debtors' day-to-day operations, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contractor Obligations.

87.     The Debtors also offer their Employees vacation time, holiday pay, paid sick days, and paid personal days as a paid benefit (collectively, the "**PTO Benefits**"). The Debtors provide their Employees with a range of PTO Benefits related to such Employees' tenure and status of employment with the Debtors. Employees may carry over certain PTO Benefits to the following year, with some accrued but unused PTO Benefits being forfeited at the end of the calendar year. Employees do not typically receive cash or money in lieu of accrued PTO Benefits at the end of a calendar year. However, in the event Employees voluntarily resign their employment and satisfy resignation procedures, at separation of employment, such Employees are entitled to receive payment for any accrued and unused PTO Benefits. In addition, in the event of an Employee's termination without cause, or due to death or disability, Employees are entitled to receive payment for any accrued and unused PTO Benefits. The Debtors estimate that, as of the Petition Date, the value of Employees' accrued PTO Benefits is approximately $382,000.

88.     In the ordinary course of business, the Debtors maintain performance-based incentive programs (collectively, the "**Incentive Programs**"). The Incentive Programs are available to the Direct Contractors and the sales associates. Monthly compensation earned under the Incentive Program for Direct Contractors is determined by the respective Facility's average monthly census. Direct Contractors are also eligible for annual bonuses of up to 40% of base salaries under the Incentive Program based on the prior year's census and net-operating income. Compensation earned under the Incentive Program for sale associates is determined by the number of new monthly resident admissions to the Debtors' Facilities. Approximately fifteen (15) Direct Contractors and sixteen (16) sales associates are eligible to receive compensation under the Incentive Programs.

89.     For those who receive it, the compensation earned under the Incentive Programs is a critical aspect of their respective overall compensation. Maintaining historical prepetition practices with regard to the Incentive Programs is essential to ensuring that the Debtors can retain their Workforce and continue to operate their business and maximize value through the duration of these Chapter 11 Cases. As stated above, compensation under the Incentive Program is driven by sales, census, and net-operating income. These metrics are financially critical to the Debtors. Moreover, the Debtors operate in an extremely competitive labor market. Any disruption to the Incentive Program would be devastating to the Debtors' workforce, business, and operations. Therefore, the Debtors seek authority, but not direction, to honor their obligations under the Incentive Programs and to maintain the Incentive Programs in the ordinary course of the Debtors' business.

90.     To minimize the personal hardship that Employees will suffer if prepetition Employee-related obligations are not paid when due, and to maintain the Employees' and Contractors' morale and commitment to the Debtors, I believe that it is critical that the Debtors be permitted to pay and/or perform, as applicable, Employee-related obligations, including: (a) wages, salaries, commissions, incentive payments, vacation and holiday pay, and other accrued compensation, (b) prepetition reimbursable business expenses, (c) prepetition contributions to, and benefits under, employees' benefit plans (medical, dental, vision), (d) remittances to various third party employee-benefit providers on behalf of employees, and all Employee Obligations as defined in the Wage Motion.

### G.     Utilities Motion

91.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (i) prohibiting Utility Providers from altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered

prepetition, (ii) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers, and (iii) establishing procedures for resolving future requests for additional adequate assurance.

92.     In connection with its day-to-day operations, the Debtors receive traditional utility services from over fifty (50) unique utility providers (each a "**Utility Provider**" and collectively, the "**Utility Providers**"). The Utility Providers are identified on the "**Utility Providers List**" attached to the proposed interim order. The Debtors paid an average of approximately $220,000 per month on account of utility services during the last year. The Debtors anticipate needing the services of the Utility Providers going forward to maintain operations of the Facilities.

93.     The Debtors propose to segregate on their books and records, within twenty (20) days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.,* approximately $121,000.00), calculated based on 50% of the Debtors' average monthly consumption of Utility Services (the "**Adequate Assurance Deposit**") into one segregated bank account designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers. Thereafter, the Debtors propose to adjust the amount in the Adequate Assurance Deposit Account to reflect several factors: (a) the termination of Utility Services by the Debtors regardless of any Additional Assurance Requests (as defined below), and (b) agreements reached with Utility Providers. These adjustments will permit the Debtors to maintain the Adequate Assurance Deposit Account with an amount that consistently provides the Utility Providers with a half-month deposit on account of such services.

94.     I believe that the Adequate Assurance Deposit and maintenance of the Adequate Assurance Deposit Account as described above, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business as provided for in the Debtors' motion

for authorization to use cash collateral filed contemporaneously herewith (together, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance of future payment to the Utility Providers to satisfy the requirements of Bankruptcy Code section 366. The Debtors' receipt of uninterrupted Utility Services is vital to the Debtors' continued business operations and, consequently, to the success of these Chapter 11 Cases. Accordingly, the relief requested herein is necessary and in the best interests of the Debtors, the estates, and creditors. Such relief ensures that the Debtors' business operations will not be disrupted and provides Utility Companies and the Debtors with an orderly and fair procedure for determining "adequate assurance." Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, creditors, and all other parties in interest.

### H.      Insurance Motion

95.      Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business and pay prepetition obligations in respect thereof, (ii) authorizing banks and other financial institutions at which the Debtors hold accounts to honor and process check and electronic transfer requests related to the foregoing, (iii) preventing insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies without first obtaining relief from the automatic stay imposed by Bankruptcy Code section 362, and (iv) authorizing, but not directing, the Debtors to continue to honor installment plan and brokerage obligations.

96.      In the ordinary course of business, the Debtors maintain over twenty (20) insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' general and professional liability, general and umbrella liability,

equipment, automobile, and flood liability (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized on the exhibit attached to the Insurance Motion.

97.     On an annual basis, the Debtors incur a total of approximately $2,000,000 in the aggregate in premiums under the terms of the existing Insurance Policies that are the subject of this Motion as well as other obligations, including other related fees and costs (collectively, the "**Insurance Obligations**"). In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

98.     The Debtors seek authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are (a) paid upfront in full at a policy's inception or renewal, or (b) financed through a premium financing company.

99.     Generally, Debtors' pre-paid Insurance Policies require upfront annual premium payments to be made at the beginning of the applicable policy period. In the ordinary course of business, the Debtors renew annual coverage under many of the policies, including certain premises and auto liability, and the Debtor pays the full amount of the premiums owed for such policies due at renewal.

100.     In the ordinary course of business, the Debtors finance the premiums on certain Insurance Policies pursuant to a premium financing agreement (the "**PFA**") with First Insurance Funding ("**First Insurance**"). The PFA finances insurance premiums for certain general liability, property, umbrella, and equipment liability policies. If the Debtors are unable to continue making payments on the PFA, First Insurance may be permitted to terminate the PFA. The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates.

101.     With respect to certain Insurance Policies, the Debtors retain the services of Propel Insurance ("**Propel**") as the broker to assist them with the procurement and negotiation of the Insurance Policies. Propel assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. Propel also provides ongoing support through the policy periods.

102.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe that any or all of these consequences could cause serious harm to the Debtors' business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

## I.     Claims Agent Application

103.     Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Epiq Corporate Restructuring, LLC ("**Epiq**") as the claims and noticing agent for the Debtors. Epiq is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related administrative aspects of chapter 11 cases. Given the number of parties in interest involved here,

I believe appointing Epiq as the claims and noticing agent will minimize the administrative burden on the Debtors and their employees while maximizing efficiency and the value of the Debtors' estates for all their stakeholders.

104.     Moreover, the Debtors submit that, based on the four engagement proposals obtained and reviewed, Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. By appointing Epiq as the claims and noticing agent in these Chapter 11 Cases, the distribution of notices will be expedited, and the Clerk will be relieved of the administrative burden of noticing. Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

### J.     RSA Assumption Motion

105.     The Debtors seek entry of an order authorizing the Debtors to assume the Restructuring Support Agreement (the "**RSA**") pursuant to sections 105(a), 362 and 365(a) of the Bankruptcy Code. Although the Debtors filed the RSA Assumption Motion on the date hereof, the Debtors are not seeking first day relief with respect to it. Rather, the Debtors will seek to have the RSA Assumption Motion at the "second-day" hearing in these Chapter 11 Cases.  Nonetheless, the RSA Assumption Motion is addressed because it directly relates these First Day Pleadings.

106.     As set forth throughout this Declaration, in order to address the challenges facing the Debtors, the Trustee, and a majority of the holders of outstanding principal amount of Series 2018A Bonds have been engaged in discussions regarding the terms of a potential restructuring. Those discussions culminated in the execution by the Parties of the RSA under which, among other things, (a) the existing Series 2018 Bonds will be exchanged for new Series 2022 Bonds pursuant to the terms and conditions described therein, (b) certain of the Consenting Holders have agreed to provide additional capital to the Debtors, in the form of new Series 2022A Bonds, to meet the Facilities' capital expenditures needs, which will be senior in priority to the other series of

41

restructured bonds, and (c) certain other obligations, including amounts owed to the Asset Manager, will be discharged.  The Restructuring is anticipated to be implemented through (i) a plan of reorganization under Chapter 11 of the Bankruptcy Code, (ii) the execution of Restructured Bond Documents, (iii) the issuance of a new series of 2022A Bonds, and (iv) the mandatory exchange of the Series 2018 Bonds.

107.    The RSA is the culmination of extensive, years' long, arm's-length negotiations between the Parties, all of who are represented by sophisticated counsel, and provides the Debtors with a clear path to confirmation of the Plan and expeditious emergence from chapter 11.  The agreements embodied in the RSA will also allow the Debtors to seamlessly continue providing healthcare services to the Debtors' residents with minimal disruption after the Effective Date, all on a timeline designed to minimize financial strain on the Debtors' businesses.

108.    Moreover, the RSA provides for a resolution of a variety of disputes that, in the absence of this agreement, would have resulted in expensive and protracted litigation that would have undoubtedly sidetracked the Debtors' reorganization efforts, extended the duration of the Chapter 11 Cases, and imposed a level of uncertainty onto the Debtors' ability to successfully reorganize and emerge from bankruptcy.  Indeed, absent the Debtors' assumption of the RSA, the Consenting Holders and the Trustee could withdraw support for the Plan and the related Plan process, which would jeopardize the Debtors' restructuring efforts and the continued operation of the Debtors' businesses, as well as cause significant costs and delays related to the Debtors' restructuring efforts.  Additionally, the restructuring of the Series 2018 Bonds and the infusion of new money to fund capital expenditures as contemplated in the RSA will significantly strengthen the Debtors' finances and better position the Debtors for long term financial stability and therefore benefit all constituents.

109.     The RSA is critical to the Debtors' ability to consummate, in the near term, a chapter 11 plan of reorganization that maximizes creditor recoveries and leaves the Debtors with a sustainable capital structure and liquidity upon emergence.   Accordingly, I believe that assumption of the RSA is an exercise of sound business judgment, is in the best interests of their estates, and should be approved.

### K.     Schedules Extension Motion

110.     Pursuant to the Schedules Extension Motion, the Debtors will seek entry of an order extending the deadline to file the (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statement of financial affairs (collectively, the "**Schedules and Statements**") by an additional fourteen (14) days, from the date such Schedules and Statements are otherwise required to be filed. The Debtors will seek to have the Schedules Extension Motion also heard at the "second-day" hearing in these Chapter 11 Cases.

111.     An extension is appropriate for the following reasons: (a) the size and complexity of the Debtors' business; (b) the number of creditors; (c) the number of interested parties; and (d) the burden that would be imposed on the Debtors to file schedules and statements within the next twenty-eight days. To completely and accurately file Schedules and Statements, the Debtors must collect, review, and analyze a substantial amount of information.

112.     Prior to the Petition Date, the Debtors, their advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. The Debtors are working expeditiously to prepare and file the Schedules and Statements, however, given the size of the Debtors' business and the amount of information required to adequately prepare such Schedules and Statements, I believe that an extension of fourteen (14) days, without prejudice to the Debtors' right to request further extensions, is an appropriate request considering the case circumstances and complexities here.

43

I declare under penalty of perjury that the foregoing is true and correct:

Dated: January 14, 2022                    */s/ Todd Topliff*
_____
                                           Todd Topliff
                                           President of Debtors

80804185.15

# EXHIBIT A

# Eagle Senior Living Corporate Organization Chart

