UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .   Chapter 11
                                .   Case No. 22-10028 (JKS)
AMERICAN EAGLE DELAWARE         .
HOLDING COMPANY, LLC,           .
ET AL.,                         .   824 Market Street
                                .   Wilmington, Delaware 19801
        Debtors.                .
                                .   Wednesday, April 27, 2022
. . . . . . . . . . . . . . .   .   11:00 a.m.


        TRANSCRIPT OF CONFIRMATION OF DEBTORS' MODIFIED
            THIRD AMENDED PLAN OF REORGANIZATION
          BEFORE THE HONORABLE J. KATE STICKLES
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES VIA ZOOM:

For the Debtors:          Polsinelli, PC
                          By:  SHANTI M. KATONA, ESQ.
                          222 Delaware Avenue, Suite 1101
                          Wilmington, DE  19801

                          Polsinelli, PC
                          By:  DAVID E. GORDON, ESQ.
                          1201 West Peachtree Street, NW
                          Suite 1100
                          Atlanta, GA  30309

(Appearances Continued)


Audio Operator:           Electronically Recorded
                          by Madaline Dungey, ECRO

Transcription Company:    Reliable
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (continued):

For UMB Bank, N.A.,        Mintz, Levin, Cohn, Ferris, Glovsky &
                             Popeo, P.C.
                           By:  NATHAN F. COCO, ESQ.
                           Chrysler Center
                           666 Third Avenue
                           New York, NY 10017

# I N D E X

**WITNESSES**                                                    **PAGE**

   **FOR THE DEBTOR**

   CHAD SHANDLER
        DIRECT EXAMINATION BY MR. GORDON            18

**EXHIBITS**                                                    **EVI**

   DOCKET NO. 314  Declaration of Stephenie Kjontvedt    17
   DOCKET NO. 317  Declaration of Todd Topliff           17

1        THE CLERK:  Counsel, you are live in the courtroom

2 and the hearing is about to begin.  Please remember to state

3 your name for the record when you speak and every time you

4 speak.  Please keep your video off and stay muted if you are

5 not speaking to the Judge so the Judge can concentrate on the

6 parties that are presenting at the time.

7        Thank you.

8        THE COURT:  Good morning.  This is Judge Stickles.

9 We're on the record in the case of American Eagle Delaware

10 Holding Company, LLC, Case Number 22-10028.  This is the time

11 set aside for the scheduled confirmation hearing.

12        I'll hear from debtors' Counsel.

13        MS. KATONA:  Good morning, Your Honor.  Shanti

14 Katona, Polsinelli, on behalf of the debtors.  Your Honor, the

15 only matter --

16        THE COURT:  Good morning.

17        MS. KATONA:  The only matter, as you noted, Your

18 Honor, is confirmation of the debtors' modified third amended

19 plan of reorganization.

20        Your Honor, unless you have any questions before we

21 get started, I'd like to turn the podium over to Mr. Gordon.

22        THE COURT:  No, that's fine.

23        Good morning, Mr. Gordon.

24        MR. GORDON:  Good morning, Your Honor.

25        As Ms. Katona said, we are here today on confirmation

of the debtors' modified third amended plan of reorganization,
filed at Docket Number 315.  In support of confirmation of the
debtors' plan, on April 22nd, the debtors filed three
documents.  We filed the balloting declaration of Stephenie
Kjontvedt of Epiq Corporate Restructuring at Docket Number 314.

       We filed the declaration of Todd Topliff, president
of the debtors, filed at Docket Number 317.  And finally, we
filed our confirmation brief, our memorandum of law in support
of plan confirmation at Docket Number 318.

       Importantly, Your Honor, no objections have been
filed to confirmation of the debtors' plan and we've resolved
all the informal objections of the United States Trustee by
putting proposed language in the amended plan and the Court's
proposed order.  The way I propose to proceed this morning,
what I'd like to do is run through our legal argument citing to
Mr. Topliff's declaration and Ms. Kjontvedt's declaration, as
appropriate.

       At the conclusion of legal argument, I'd like to
offer those declarations into evidence and provide any party
who wishes to cross-examine them an opportunity to do so.  And
then, I'd like to proceed with the direct examination of
Mr. Chad Shandler of FTI, the debtors' financial advisors.

       THE COURT:  Okay.  Thank you, Mr. Gordon.

       MR. GORDON:  So, Your Honor, as set forth in our
confirmation brief, the plan meets all the requirements of

1  confirmation set forth in Section 1129 of the Bankruptcy Code.

2          Starting with Section 1129(a)(1), which requires that

3  the plan comply with the Bankruptcy Code, the plan complies

4  with all of the applicable provisions of the Bankruptcy Code,

5  the Bankruptcy Rules, and the local rules.  It's also the best

6  means for reorganizing the debtors' business.  Going to the

7  applicable provisions of the Code, starting with Section 1125,

8  proper solicitation, as set forth in the Topliff declaration,

9  the debtors complied with the disclosure statement order,

10 including the solicitation procedures in all respects.  Votes

11 to accept or reject the plan were solicited and tabulated

12 fairly in good faith in a manner that is consistent with this

13 Court's disclosure statement order of the Bankruptcy Code and

14 the Bankruptcy Rules.

15         Turning to the next applicable requirement,

16 Section 1122 of the Bankruptcy Code, proper classification, the

17 debtors assert that the plan properly classifies claims on

18 interest.  The plan has nine classes.  Other priorities

19 -- Class 1 is other priority claims, Class 2 is other secured

20 claims, Class 3 is the Series 2018A-1 bond claims, Class 4 is

21 the 2018A-2 bond claims, Class 5 is the Series 2018B claims,

22 Class 6 is the 2018C claims, Class 7 is our general unsecured

23 creditor class, Class 8 is intercompany claims, and Class 9 is

24 (indiscernible).  So the debtors have property classified

25 claims and interests into separate legally distinct classes.

1        All claims and equity interest within a class are

2   substantially similar.  And in addition, each claim and equity

3   interest differs from the claims and equity interest in the

4   other classes.  So accordingly, the debtors assert that the

5   classifications comply with the Bankruptcy Code Section 1122.

6        Turning to the next applicable requirement of the

7   Code, Section 1123(a)(3), the required provisions that must be

8   in the plan.  Section 1123(a) requires that a plan designate

9   claims and interest, explain which claims and interest are

10  impaired or unimpaired, provide for equal treatment within each

11  class, provide an adequate means of implementation and make

12  certain disclosures.  And as set forth in our confirmation

13  brief and in the Topliff declaration, each of these

14  requirements have been met.

15       Turning to 1123(b), which is permissible provisions,

16  the plan does contain debtor releases, third-party releases, an

17  injunction, and exculpation provisions, all of which are

18  permissible provisions in a Chapter 11 plan.

19       Beginning with the debtor releases.  Pursuant to the

20  Bankruptcy Code, the debtors may release claims if the release

21  is a valid exercise of the debtors' judgment, it's fair and

22  reasonable, and is in the best interest of the estate.  And

23  here, in this plan, the proposed debtor releases are a valid

24  exercise of the debtors' business judgment.  They play an

25  important role in the overall plan of reorganization and

1  they're appropriate under the master mortgage factors as set

2  forth in our brief.  And further, they're supported by the

3  debtors' creditors.

4       With respect to the third party releases, just like

5  the debtor releases, the third party releases are an essential

6  component of the plan.  Consensual third-party releases can be

7  contained in a plan pursuant to the authority granted under

8  Section 105(a) of the Bankruptcy Code.  And here, the third-

9  party releases are the result of negotiations and back and

10 forth with the Office of the United States Trustee.

11      And so the third-party releases, they're narrow,

12 they're only by holders of claims that voted to accept the

13 plan, or voters that voted to reject the plan without

14 affirmatively opted in.  So as a result, these third-party

15 releases are consensual and they're permissible under the

16 Bankruptcy Code.

17      With respect to the plan injunction, the plan

18 injunction provisions simply seek to assure that parties

19 don't interfere with the consummation and implementation of the

20 plan, they're narrowly tailored, their customary in this

21 district, and they're necessary to effectuate a plan.

22      Finally, with respect to exculpation, exculpation

23 provisions are appropriate when the protection given in the

24 exculpation clause is necessary and is given in exchange for

25 fair consideration.  Typically, a state fiduciary and other

1  parties involved in the implementation of the plan are granted

2  exculpation provisions.  And in this case, the exculpation

3  provisions, just like the third-party releases, are the result

4  of discussions with the United States Trustee, so that they're

5  very narrowly tailored.

6          They apply only to estate professionals.  And so on

7  that basis, the debtors assert that the permissible provisions

8  to the plan set forth, you know, as authorized by 1123(b) of

9  the Bankruptcy Code, have been met.  And so with that, the

10 requirements of 1129(a)(1) are satisfied.

11         Turning to 1129(a)(2), the requirement that the

12 debtors comply with the Bankruptcy Code, as set forth in the

13 Topliff declaration, the debtors have complied with the

14 Bankruptcy Code in all respects and in the solicitation and

15 tabulation of the votes on the plan.

16         With respect to 1129(a)(3), the requirement that the

17 plan be proposed in good faith, as set forth in the Topliff

18 declaration, the plan is the result of months of collaboration

19 and arms-length negotiations among the debtors, the Trustee,

20 the consenting bond holders, and the plan, you know, was

21 formulated with a legitimate, honest purpose of restructuring

22 the debtors' affairs and allowing the debtors to continue with

23 the going concern for the benefit of all parties

24 (indiscernible).

25         With respect to 1129(a)(4), the required disclosures,

1  the plan provides that any payments made or promised by the

2  debtors' estates for services rendered in connection with these

3  Chapter 11 cases have been or will be subject to review by the

4  Court and by all parties in interest, and so the requirements

5  of 1129(a)(4) are met.

6       With respect to the 1129(a)(5), another set of

7  required disclosures, as set forth in the plan and the Topliff

8  declaration, the plan discloses the members of the Board of

9  Directors and the Officers of the debtors as of the petition

10 date and discloses that they will remain in their current

11 capacities upon confirmation of the plan.

12      Section 1129(a)(6), applying the rate changes, is

13 inapplicable to these debtors.  Section 1129(a)(7) is the best

14 interest of creditors (indiscernible), and this provision of

15 the Code requires that holders of claims or interests either

16 vote to accept the plan or they will receive as much as they

17 would in a liquidation under Chapter 7.

18      Here, the plan makes clear that the distributions

19 available to creditors under the plan are greater than what

20 creditors would receive in a Chapter 7 liquidation.  We had

21 submitted a liquidation analysis in the plan supplement filed

22 by the debtors and Mr. Chandler [*sic*] will

23 further -- Mr. Shandler Shannon will further testify with

24 respect to that liquidation analysis and that the requirements

25 of 1129(a)(7) have been met.

1    With respect to 1129(a)(8), acceptance by creditors,

2    as set forth the Kjontvedt declaration, here holders of claims

3    in Classes 1, 2, and 9, are unimpaired.  They're deemed to

4    accept the plan.  Holders of claims in Classes 3, 4, 5, and 7

5    are impaired, but they voted to accept the plan.  And then

6    holders of claims in Class 6 are impaired, but they voted to

7    reject the plan.  And then holders of claims in Class 8 are

8    impaired.  They're deemed to reject the plan.

9    So, although we haven't met the requirements of

10   Section 1129(a)(8) in that all impaired accepting classes have

11   not voted to accept the plan, the debtors intend to confirm the

12   plan via the cram-down provision of Section 1129(b), which I'll

13   get to later in my argument.

14   Turning to Section 1129(a)(9) of the Bankruptcy Code,

15   payment in full of priority claims.  Here, the plan provides

16   for payment of all administrative expense claims, accrued

17   professional compensation claims, property tax claims, and all

18   other priority claims.  It's not required and has been met.

19   1129(a)(10) requires an impaired accepting class.  As

20   set forth in the Kjontvedt declaration, holders of claims in

21   Classes 3, 4, 5, and 7 are all impaired and they all voted to

22   accept the plan.  We believe we've met that requirement.

23   With respect to the 1129(a)(11), feasibility,

24   1129(a)(11) involves two determinations.  The first is the

25   debtor's ability to consummate the provisions of the plan.  The

12

1 second is that the debtor's ability to reorganize is a viable

2 entity.  And, Your Honor, this is a relatively low threshold.

3         Feasibility doesn't require a guaranty of success, it

4 requires a reasonable assurance of compliance with the plan

5 terms.  Here, this plan is a plan of reorganization.  Under the

6 plan, the debtors will reduce their secured bond obligation

7 significantly, will receive a new infusion of $28 million,

8 which the consent holders have committed to doing, and as set

9 forth in their financial projections and the confirmation

10 brief, that debtors have sufficient funds to meet their -- will

11 have sufficient funds to meet their post-confirmation

12 obligations.  And we'll also be presenting testimony from

13 Mr. Shandler today to that effect that the plan is feasible.

14         1129(a)(12), statutory fees, the plan provides that

15 all statutory fees will be paid by the debtors until the

16 Chapter 11 cases are either closed, converted, or dismissed.

17         There are three provisions on 1129(a) that are

18 inapplicable.  Those are 1129(a)(13), continuation of

19 retirement benefits; 1129(a)(14), domestic support obligations;

20 and 1129(a)(15), which applies only to individuals.  And so

21 those provisions are not applicable to these debtors.

22         Section 1129(a)(16), compliance with law governing

23 non-profit companies.  This provisions requires that all

24 transfers of property of a not-for-profit corporation under a

25 plan must be in accordance with applicable provisions of

1  non-bankruptcy law.  Here, the plan doesn't provide for the

2  transfer of any of the debtors' assets, and so that provision

3  is also (indiscernible).

4      The next step, Your Honor, is 1129(b), the cram-down

5  provisions of the Bankruptcy Code.  And the debtors assert that

6  the plan satisfies the requirements of 1129(b) with respect to

7  the rejecting classes.  But, Your Honor, 1129(b), to satisfy

8  that requirement, the debtors have to show that the plan does

9  not discriminate unfairly and that the plan is fair and

10  equitable.

11      And here, Classes 3 through 8 are impaired under the

12  plan.  Class 3, Class 4, Class 5, which are all bond claims,

13  they all voted to accept the plan.  Class 6, which contains the

14  2018C bond claims, voted narrowly to reject the plan.  And

15  then, Class 7, the general unsecured claims, voted to reject.

16  Class 8, intercompany claims is deemed to reject the plan

17  (indiscernible) because --

18      THE COURT:  Class -- I'm sorry.  Mr. Gordon, did you

19  say Class 7 rejected the plan?

20      MR. GORDON:  No, no.  Class 7 voted --

21      THE COURT:  Okay.

22      MR. GORDON:  -- to accept the plan.  So that's the

23  general unsecured class.  But the rejecting class is Class 6.

24      THE COURT:  Okay.  I just want to make sure.  I

25  misunderstood you.

1           MR. GORDON:  So, Your Honor, with respect to Class 6,

2    the plan is fair and equitable in this case because no order of

3    a claim or interest that's junior to the claims of an impaired,

4    non-accepting class will receive or retain any property under

5    this plan.  The debtors assert and will demonstrate through

6    Mr. Shandler's testimony here today that holders of claims in

7    Class 6 are claims of equal -- Classes 6 and 7, so the C bond

8    holders and the general unsecured claims.  Those claims are of

9    equal priority.  As set fort in the indenture and the master

10   indenture, which we filed with the Court as appended to

11   Mr. Topliff's declaration, the bond documents have strict

12   subordination provisions.  So in the event of default, you

13   know, the A's have to be paid before the B's, the B's have to

14   be paid before the C's, and then there's that strict priority

15   among A, B, and C.

16          As we will demonstrate through Mr. Shandler's

17   testimony, based on the analysis performed by the debtors and

18   the Trustee and their respective professionals, which analysis

19   was the basis for the restructuring support agreement and the

20   plan in this case, absent the consent of the 2018A and B

21   holders, absent the compromise that that the B bond holders

22   made, claimants in Classes 6, 7, and 8 would not be entitled to

23   receive anything under this plan.

24          So put another way, Class 6, the rejecting class, is

25   receiving a far greater recovery under this plan than they

1  would be entitled to outside the plan because of the compromise

2  that was made by the Class B bond holders.  And absent that

3  compromise made by the Class B bond holders and Class 5, which

4  voted to accept the plan, we could get no distribution to

5  either Class 6 or Class 7, and so Classes 6 and 7 are on equal

6  footing or of equal priority.  You know, and because no one

7  junior to the holders of claims in Class 6 or 7 are receiving

8  anything under the plan, the plan satisfies the cram-down

9  requirements in (indiscernible).

10         With respect to the equity -- with respect to the

11  Class 9 interests under the plan, here, the debtors are non-

12  profit entities.  The equity ownership in the debtors is deemed

13  to be held by the public, not by any individual or entity, and

14  so Class 9 interests are preserved, but there's no other

15  distribution or value (indiscernible) interests.  Accordingly,

16  under the plan, no class of claims or interests junior to any

17  rejecting class is receiving or retaining any property under

18  the plan and the plan is therefore fair and equitable.

19         The plan does not unfairly discriminate because each

20  class is legally distinct from one another and each descending

21  class is receiving more than its baseline entitlement due to

22  the compromise being made by the B bond holders here.

23         Your Honor, therefore, the debtors submit that the

24  cram-down requirements of the Bankruptcy Code and

25  Section 1129(b) have been satisfied, as we'll further

1  demonstrate through the testimony of Mr. Shandler.  Therefore,

2  the plan is fair and equitable and the plan does not unfairly

3  discriminate against any rejected class.

4          With respect to 1129(c), that's the requirement that

5  there's only one plan.  No other plan is being confirmed or

6  contemplated at this time.  And then, finally, 1129(g)

7  avoidance of taxes.  As set forth in the Topliff declaration,

8  the principal purpose of the plan is not the avoidance of

9  taxes.

10          So that is our argument in support of confirmation of

11  the plan.  At this point, I would like to proffer the Topliff

12  declaration and proffer the Kjontvedt declaration and allow

13  these parties to be cross-examined by anyone that wishes to be

14  heard.

15          THE COURT:  Okay.  Does anyone have an objection to

16  the admission of the Topliff declaration at Docket Number 318

17  [*sic*] or the balloting declaration at 314 into evidence?

18     (No audible response)

19          THE COURT:  I hear none.  Both of those declarations

20  are admitted without objection.

21          Does anyone intend to cross-examine either of the

22  declarants regarding the content of their declarations?

23     (No audible response)

24          THE COURT:  Okay.  I hear none.

25          Those declarations are admitted.

1      (Docket Numbers 314 and 317 are admitted into evidence)

2           MR. GORDON:  Your Honor, at this point, the debtors

3 wish to call Chad Shandler, the debtors' financial advisor, to

4 testify in support of confirmation of the plan.

5           THE COURT:  Okay.  Thank you.

6           I can see Mr. Shandler on screen.  Ms. Dungey, would

7 you please swear in the witness?

8           THE CLERK:  Yes.  Please raise your right hand.

9         CHAD SHANDLER, DEBTORS' WITNESS, SWORN

10         THE CLERK:  And could you please state your full name

11 and spell your last name for the record?

12         THE WITNESS:  Chad Shandler, S-H-A-N-D-L-E-R.

13         THE CLERK:  Thank you.

14         THE COURT:  Mr. Shandler, before your testimony

15 begins, can you tell the Court where you're located?

16         THE WITNESS:  Currently, I am in Scarsdale, New York.

17         THE COURT:  Okay.  Are you in a home or in your

18 office?

19         THE WITNESS:  I am in my home office.

20         THE COURT:  Okay.  Are you alone in the room, sir?

21         THE WITNESS:  I am, Your Honor.

22         THE COURT:  Okay.  I'm instructing you to please stay

23 alone in your room until your testimony is complete this

24 morning.  If you need to take a break, please let us know and

25 we'll take a break.  But while you are testifying, you need to

1  be alone.

2          Also, I'm instructing you not to look or read at any

3  email or texts during your testimony, including during any

4  breaks.  If you have anything that you need to refer to or look

5  at in connection with your testimony, please tell us what

6  you're looking at so we know if you're referencing anything

7  because obviously we can't see you.

8          Do you understand these instructions, sir?

9          THE WITNESS:  I do, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          You may proceed Mr. Gordon.

12                    *DIRECT EXAMINATION

13  BY MR. GORDON:

14  Q    Good morning, Mr. Shandler.

15  A    Good morning.

16  Q    Could you state what is your position with FTI Consulting?

17  A    I'm a senior managing director in our corporate finance

18  and restructuring practice and the co-head of our healthcare

19  restructuring practice.

20  Q    And so in that role, could you just describe generally

21  what it is that you do at FTI consulting?

22  A    So as a senior managing director, my responsibilities are

23  I am the primary person responsible for most of the matters for

24  which I am working on, any client engagements.  That goes to

25  supervising all of the work.  In cases like this, it would be

1 similar to preparation of cash flow projections, preparation of

2 operating projections, development of restructuring plans.

3 Obviously, I am also responsible for soliciting new work from

4 new clients as well.

5      In terms of running the healthcare or co-leading the

6 healthcare restructuring practice, I am also charged with the

7 development of the skills and services within that practice

8 segment.

9 Q    Thank you.

10      And now, could you just, briefly, what's your educational

11 background?

12 A    I have a Bachelor's of Science in Business Administration

13 from the Olin School of Business at Washington University.   I

14 am also a certified public accountant, both in the States of

15 New York and New Jersey.

16 Q    How long have you been with FTI?

17 A    Since September of 2018.

18 Q    Before that, where did you work?

19 A    Before that, I was a partner in the accounting and

20 consulting firm of CohnReznick, where I had been for almost 10

21 years.   My last position there was, again, both a partner as

22 well as the national practice leader for their restructuring

23 dispute resolution practice.

24 Q    And so overall, how long have you been in the

25 restructuring industry?

1 A    Almost 30 years.

2 Q    And can you just briefly describe your background in the

3 healthcare restructuring space?

4 A    Primarily, it started in 2000, which was the transition

5 of -- with the Medicare system from what had been a cost-plus

6 system to a credit-prospective payer system.  That was my first

7 introductory into really skilled nursing facilities or nursing

8 homes, where I worked on a fairly significant chain of nursing

9 homes at that particular point in time.

10       Since 2006, pretty much 80 percent of my time has been

11 spent more or less in the senior living space or in some

12 fashion of the healthcare space.  This includes continuing care

13 retirement communities, independent living, assisted living

14 memory care, assisted living, and skilled nursing facilities,

15 as well as acute care hospitals, critical access hospitals, and

16 free-standing emergency rooms.

17 Q    Thank you for that.

18       So getting to this case, in particular.  So when did you

19 start working with what are now the debtors in these Chapter 11

20 cases?

21 A    Approximately May of 2020.

22 Q    And when you were engaged in May of 2020, what did you

23 understand to be the purpose of your engagement?

24 A    The initial focus of the engagement was to actually focus

25 on the cash flow of what are now the debtors, determining how

1 much runway they had, and what obligations they could satisfy.

2 In particular, whether or not there was sufficient cash

3 available to make certain payments into the massive trust

4 indenture related to its bond obligations, and yet still have

5 sufficient cash available to care for our residents and operate

6 the business in the ordinary course.

7 Q    At the time you were retained, were the debtors in

8 compliance with their obligations under the bond documents?

9 A    They were not.  They had -- they had ceased making monthly

10 bond payments to the master trust indenture -- to the master

11 trustee.

12 Q    So your initial task was cash forecasting.  Did you

13 prepare budgets and cash flows for the debtors?

14 A    We did.  We had analyzed the operations of the debtors up

15 until that particular point in time, taking into account what

16 their expense run rate would wind up being, as well as the

17 impact of occupancy.  Obviously, at this particular point in

18 time, we had just entered the pandemic, which had a significant

19 impact on the debtors' occupancy, which is the main driver for

20 its revenue and cash receipts during this period of time, as

21 well as evaluating the increased expenses associated with

22 operating a healthcare facility during the pandemic.

23     And this analysis was not done just on a holistic basis,

24 but we actually did look at each individual facility that the

25 debtors were operating because it is -- you do need to

1 understand how each facility is itself being impacted by its

2 own operations and by the market area.

3 Q    And this cash forecasting analysis you did, did this

4 result in any agreements with the bond holders?

5 A    It did.  It resulted in July of 2020 a forbearance

6 agreement with the bond holders, which was then subsequently

7 extended multiple times.

8 Q    Okay.  So once that phase of your engagement was

9 completed, we were under forbearance, what happened next?  What

10 did you do next?

11 A    Well, that was the next stage because now we had the

12 breathing room, if you will, to be able to -- we came to

13 agreement with the bond holders with regard to what expenses

14 and what potential debt service we may have paid or caught up

15 with in a particular period of time.  And now, it was moving

16 into what could we -- what would the company actually look like

17 on a go-forward basis.

18     Again, just as we did on the cash flow analysis, we

19 analyzed each individual property of the debtors, meaning each

20 actual facility that the debtors operate and looked at it in

21 terms of also the services that each facility was providing.

22 As we know -- as we now know, and I think it has been disclosed

23 previously, some facilities are independent living, some do not

24 have independent living, there's assisted living, and memory

25 care services that are being provided, potentially all or a

1 part or some with regard to each one of the facilities.

2      We actually went on virtual site visits of each of the

3 facilities because we could not go on the campus during that

4 particular period of time because of the pandemic restrictions.

5 We interviewed key people at the facilities, meaning primarily,

6 the executive director as well as the marketing and sales

7 staff, if there were other key positions, for example, plant

8 operations, understanding the capital expenditure needs that

9 would occur at each of the different facilities.  And we

10 analyzed the financial trends, again, historical, with regard

11 to each of the facilities, and determined certain assumptions,

12 both with regards to expenses, as well as occupancy going

13 forward until we reached the point of stabilization and to try

14 to determine the amount of funds available for debt service

15 that would be generated and that's the amount of funds that we

16 would be able to use to satisfy, potentially satisfy, at least

17 in part, our debt obligations going forward.

18           So all of that work was being done in order to get to

19 a point to have a meaningful negotiation with our various

20 creditor constituencies.

21 Q    And so the funds available for debt, sir, what is that?

22 In layman's terms, what is -- is that like the amount of debt

23 the debtors could support?

24 A    It's not.  It's actually -- it's more than that.

25      What the funds available for debt service is it analyzes,

1  after I consider all my cash receipts that will be coming in in

2  any given period of time and all of my operating expenses that

3  would be required to be paid over that period of time, what is

4  left over is what we generally call our funds available for

5  debt service.

6       Now, what that number then winds up being separated into

7  is, it's also requirements for potentially CapEx requirements,

8  liquidity requirements, and then also, funds to satisfy our

9  debt obligations.  So that number is really made up of, or can

10 service, three different various components.  What ultimately

11 happens is is that you determine both what your liquidity needs

12 are, and by that, we mean general working capital, cash flow

13 that's required to maintain the business in the ordinary

14 course, potential capital expenditures, and we also apply what

15 we call a debt service coverage ratio, which is basically how

16 much cash am I using to service my debt versus compared to what

17 my total funds available to service debt, liquidity, and

18 capital expenditures are.

19      So it is -- it is the whole -- it's the whole that then

20 gets divided up into more or less three parts.

21 Q    And in determining what the debtors' funds available for

22 debt service would be, what were the fundamental assumptions

23 that you made?

24 A    That we would ultimately reach stabilization.  And when we

25 say stabilization, we mean a level of occupancy within the

1  entire portfolio that can be maintained in the long term.

2       As we know, dealing with the pandemic, most senior living

3  facilities took a significant dip in their occupancy,

4  especially in the assisted living areas.  So it was a matter of

5  how long will it take us to get back up to a normalized level

6  of occupancy.  In this case, we viewed basically around 94

7  percent as the sustainable level of occupancy going forward.

8  So that was a major assumption that we anticipated would occur

9  by 2024.

10      Other major assumptions would be dealing with staffing,

11 expenses related to our workforce, the ability to get our

12 workforce, things with regard to food, dealing with the

13 management company as well, as well as capital expenditures and

14 maintaining or getting the properties back up to a level that

15 we thought we could sustain in the long term.  So those are

16 some of the major assumptions that we took into account.

17 Q    And so once you came up with this, the funds available for

18 debt service at stabilization, what happened next?

19 A    At that point, we really entered into more -- into real

20 hardcore negotiations as I would call them with the indenture

21 trustee or master trust indenture trustee and his advisors.

22      At this point, what we had determined was we knew how much

23 cash we had available to service debt in some capacity.  And we

24 also knew what our capital expenditure requirements what we

25 thought they would wind up being going forward.  And we also

1 were fairly confident with regard to the level of liquidity

2 that we wanted to be able to maintain in the business.

3      And obviously, these are factors that are important to all

4 constituencies, especially in trying to turn recovery to all

5 the various constituencies.  And through those negotiations and

6 the funds available for debt service, while we had multiple

7 rounds of capital structures, in terms of capital structures,

8 again, with the master trustee and his advisors, we ultimately

9 agreed on a capital structure that would both provide new money

10 to the debtors, primarily for CapEx, as well as provide some

11 additional liquidity in the more challenging beginning times to

12 make sure that we could do the liquidity and get to a

13 stabilized platform, as well as have appropriate reduction to

14 the various levels of debt that we could ultimately service

15 over the length of the bonds, or the length of maturity of the

16 bonds.

17 Q    Are you familiar with the financial projections that were

18 appended to the debtors' disclosure statement, the disclosure

19 statement entered at Docket 216?

20 A    Yes, I am.

21 Q    Were you involved in the preparation of those financial

22 projections?

23 A    I was.

24 Q    Can you just walk us through those and explain what those

25 projections demonstrate?

1  A    In the end, what they demonstrate is is that over this

2  period of time, the debtors will once again achieve a

3  stabilized level of occupancy, as well as a stabilized level of

4  cash flow or funds available for debt service to be able to --

5  and to be able to have the cash available to provide the

6  necessary CapEx to bring the properties back up to their

7  appropriate level of operations.  It also shows that it will

8  have sufficient cash flow to be able to meet the debt

9  obligations as they are currently being restructured into their

10 various series in accordance with the plan.

11 Q    Okay.  Thank you.

12      Are you familiar with the liquidation analysis that was

13 appended to the debtors' plan supplement, which was -- it was

14 Exhibit A to the plan supplement, which is at Docket 277?

15 A    I am.

16 Q    Were you involved in the creation of this liquidation

17 analysis?

18 A    I was.

19 Q    Could you just briefly walk us through it?

20 A    So we, as when we normally do our liquidation analyses,

21 break the debtors' assets into various, you know, routine

22 classes, things with regard to cash, accounts receivable,

23 prepaid expenses, as well as land, building, fixtures, and the

24 like.

25      So most of this, to the extent that they are what we call

1  current assets, cash is cash.  That is a relatively easy number

2  to develop.  Accounts receivable, we always assume with regard

3  to a liquidation, that people who owe you money are also going

4  to be less likely to want to pay you money.  So we do take

5  appropriate, what we consider appropriate discounts based upon

6  what the debtors' accounts receivable looks like at the date

7  and time that we do the liquidation analysis.

8       Most of our accounts receivable -- frankly, most of our

9  revenue is paid current because it's billed in advance at the

10 beginning of the month and collected.  Otherwise, we have to

11 deal with each one of those residents individually.  So that

12 becomes less of an issue.

13      Prepaid expenses are more or less based upon if there's

14 any opportunity to get money back from that.  As we looked at

15 it in terms of the debtors really operating assets or each one

16 of the facilities, we looked at that from the standpoint of

17 what similar transactions have -- the transactions of the sale

18 of similar facilities have been going from a comparable

19 transaction basis and discounted those at different levels,

20 given the fact that this is a liquidation.  And generally

21 speaking, you do not get full-going-concern value as it relates

22 to properties being sold within the liquidation.

23      At the end of the day, we viewed that there was

24 approximately, on a low end, roughly about $87 million, and

25 kind of high-end, roughly about $132 million, that would be

1  generated from the liquidation of the debtors' assets.

2  Q    And so at that liquidation range, 87 million to 132

3  million, what would that mean for creditor recoveries in a

4  liquidation?

5  A    That would mean that no creditor class would receive a

6  hundred cent recovery.  And, at most, the only creditor class

7  beyond the Chapter 7 Trustee's claims, with one to be in the

8  2018 Series A bond holders, and they would not receive a

9  hundred percent recovery.

10 Q    And why is it that only, at a liquidation value of 87 to

11 100 -- I assume it's 132?  Why is it that only the A's would

12 obtain a recovery?

13 A    Because the master trust indenture lays out a very

14 specific plan with regard to the distribution of recoveries or

15 of assets within the various series, and the Series B and the

16 Series C are subordinate to the A.  The B's are subordinate to

17 the A, the B's and C's are subordinate to the A's, and the C'S

18 are subordinate to the B's.

19 Q    Okay.  Now, I want to talk about the plan and the

20 treatment of the C bond holders under the plan.  Based on all

21 the analyses you've done, so the liquidation analysis, your

22 financial projections in support of feasability, and the FADs

23 analysis, do you believe that the claims of the 2018C bond

24 holders in Class 6, are they secured or are they unsecured?

25 A    They are unsecured.

1  Q    How do you know that?

2  A    We actually looked at it from I would say a few different

3  points of view to determine where the Series B -- what the

4  2018 Series B class would wind up falling out with regard to

5  our overall analysis.  As we know, right now, the 2018 Series A

6  are being reinstated at the par plus accrued interest amount

7  and being serviced.  The principal and interest are -- interest

8  is being serviced on an interest-only basis up until 2037,

9  which is when our 2022A's are fully paid off.  And then, they

10 will start receiving principal.

11      Now, the 2018B's would not receive -- would not start

12 receiving payments under the current structure until, roughly,

13 2042.  So we looked at this at a few different ways.

14      The first would be going back to something we talked about

15 earlier, Mr. Gordon, which was the funds available for debt

16 service analysis.  So we started -- if you look at it from that

17 standpoint, and as I just stated, the 2022A's, again, the

18 restructured 2018 -- sorry, the 2022B's, which are the

19 restructured 2018A's, do not start receiving principal and

20 interest until 2037.  And in large part, they start receiving

21 principal at that particular point in time because we have paid

22 off the new money, 2022A's, and we are repurposing the funds,

23 or the funds are being repurposed that previously serviced the

24 debt of the 2022A's to now fund the full principal and interest

25 amortization on the Series 2022B's.

1     When you look at the amount of cash that is available on a
2  funds-available-for-debt-service basis, after servicing the
3  2022B's, and you consider the amount of cash that is required
4  to provide CapEx for the debtors and provide sufficient
5  liquidity going forward, what you find is that there are only
6  roughly about $1.5 million available to service that debt at a
7  debt service coverage ratio of approximately 1.29.
8     Now, when we normally look at restructuring debt, we look
9  at various debt service coverage ratios.  But again, that's a
10 number, or a factor.  You ultimately need to look at the net
11 cash that's actually available and see if that actually meets
12 your requirements as well to back into an appropriate debt
13 service coverage ratio as well.  Again, it's one factor that is
14 considered.
15    When you look at the 20 -- if the 1.5 million,
16 approximately, of funds available for debt service on a 20-
17 year, 21-year amortization, which is the remaining useful life
18 of the property for tax purposes, which is what the -- which is
19 what we're all looking at, which is ultimately a 35-year
20 amortization from where we are today, that would show that the
21 only -- that the level of debt that could be supported is
22 roughly $18 million at the Series 2018B interest rate of
23 roughly about 5.72 percent.  So basically, if we were to
24 restructure the debt of the 2018B's based upon the funds
25 available for debt service, the amount of term that is left

1  over and the interest rate which they are currently contracted

2  at, we would only be able to serve roughly $18 million of

3  principal, which is obviously less than the $36 million of

4  principal that they currently are owed today.

5          The other way we looked at it was we looked at the cash

6  flow stream that the 2022C's would receive under the plan.

7  And, as I believe I testified earlier, they would not receive

8  cash flow based upon the waterfall until, roughly, 2042.  From

9  that point forward until their obligation is paid off, they

10  will receive a nominal amount, meaning a not-adjusted-for

11  inflation or interest or time value of money of close to $30

12  million.  But that is that value starting in 2042 going

13  through, roughly, 2053 or 2054.

14          When you consider the time value of money on a

15  conservative basis using, again, the interest rate that they

16  currently have on the 2018B bonds of 5.72 percent, and I say

17  conservative because when you consider the subordinate nature

18  of this debt, it should be higher than what the other higher

19  level series of debt could be.  But, again -- so, if anything,

20  it would -- the present value, or the net present value of the

21  cash flow stream would be lower than what I'm about to suggest,

22  but when you do look at the net present value of that payment

23  stream, you are looking at something no more than $7.4 million.

24          So if I took what they are actually getting in terms of

25  cash pursuant to the plan and looked at it in today's dollars

1  on a conservative basis, again, that would be roughly $7.4

2  million against the $36 million current claim.  Again, less

3  than the full amount, and therefore, when you look at the

4  series, the recovery to the 2018 Series B's and the fact that

5  it is in fact significantly less on a present value basis or on

6  a serviceable basis than what the current claim would be, that

7  would suggest that, given the fact that the Series C -- sorry,

8  the 2018C's, are subordinate to the B's and the other classes

9  are unsecured, that therefore, the 2018C's must therefore be

10 unsecured as well as the unsecured creditors.

11 Q    So if we -- if over the 35-year life of the plan, the

12 existing life of the facilities, if the debtors, you know,

13 contributed all their funds available for debt service, per

14 your analysis to service a debt, absent the compromise made by

15 the B's, the writing off 50 percent and lowering their interest

16 rate, if that did not happen and the debtors use all the funds

17 available for debt service for 35 years to service debt, would

18 we ever get any money for the 2018C's?

19 A    You would not.

20 Q    And how is it that we're able to get money to the 2018C's

21 up to this point?

22 A    Because the 2018B's are gifting and providing a portion of

23 their recovery to both the 2018C's, as well as the general

24 unsecured creditors.

25            MR. GORDON:  Your Honor, I don't have any further

1  questions for Mr. Shandler.

2          THE COURT:  Is there any cross-examination of

3  Mr. Shandler?

4      (No audible response)

5          THE COURT:  I hear none.

6          Mr. Shandler, you're excused.  Thank you for your

7  testimony.

8          THE WITNESS:  Thank you, Your Honor.

9      (Witness excused)

10          MR. GORDON:  Your Honor, that is our case in support

11  of confirmation of the plan.  I believe the debtors have

12  demonstrated that we have satisfied all the applicable

13  requirements of Sections 1129(a) and (b) for confirmation of

14  the plan.  Importantly, no objections have been filed to

15  confirmation of the plan.

16          And for the reasons set forth today and based on the

17  debtors' legal argument and the evidence the debtors have

18  presented to the Court, the debtors request that the Court

19  confirm the plan.

20          THE COURT:  Okay.  Does anyone wish to be heard with

21  respect to the plan?  Or does anybody have any objection to

22  plan?

23      (No audible response)

24          THE COURT:  Okay.  I hear none.

25          Mr. Gordon, I have a few questions.  Can you tell me

1  what is the amount of the allowed 2018B deficiency claim?

2         MR. GORDON:  It would be 50 percent of the 2018B

3  claim.  So it was 50 percent of it is being written off.  So I

4  think, let me look at my notes here.

5         THE COURT:  So they get the full 50 percent as a

6  deficiency claim?

7         MR. GORDON:  Yes, Your Honor.

8         THE COURT:  And so what is the composition of

9  Class 7, the GUC claim?  What proportion of that claim in

10 Class 7 are deficiency claims held by the 2018 bond holders?

11        MR. GORDON:  So Class 7, it would be 50 percent of

12 the Class B claim would be treated -- received by Class 7

13 treatment, which is the pro rata share of the $250,000.

14        THE COURT:  Okay.  Bear with me a second.  I'm just

15 reviewing my notes.

16    (Pause)

17        THE COURT:  Just, I have one other question.

18        The plan defines the 2018A-1 and 2018B-1 bond claims

19 as allowed secured claims and the 2018B and C bond claims as

20 allowed under the terms of the plan, including the deficiency

21 claim.  Can you explain this distinction?  What the purpose?

22        MR. GORDON:  Could you say that -- could you ask that

23 question one more time?

24        THE COURT:  Yeah, so the plan defines the 2018A-1 and

25 2018B-1 bond claims as allowed secured claims, and the 2018B

1  and C bond claims, it just states they're allowed under the

2  terms of the plan and includes the deficiency claim.  I'm just

3  curious the distinction with using the term allowed secured

4  claims for 2018A-1 and B-1.

5      MR. GORDON:  Well, Your Honor, so the debtors owed

6  the money to UMB Bank as Trustee, right?  So the actual

7  creditor to whom the debtors have an obligation is UMB.  UMB

8  has a secured claim.  They have liens and security interests on

9  substantially all of the debtors' assets, and so that's why

10 those claims are labeled as secured claims because they are --

11 they comprise a portion of what the debtors owe to UMB, which

12 is a secured claim.  As far as the deficiency, I think the

13 deficiency is treated --

14     THE COURT:  But I don't think -- I don't -- but

15 allowed claim isn't a defined term, I guess is what I'm driving

16 at.  Allowed -- I understand why they're characterized that

17 way.  And allowed secured claims is a defined term but I don't

18 think allowed claim is, and maybe I missed it.

19     MR. COCO:  Your Honor?

20     THE COURT:  Like the distinction between allowed

21 secured versus allowed claim.  Does that make sense?  What I'm

22 asking.  2018A-1 and A-2 are defined allowed secured, but 2018B

23 is just allowed claim.  Just want to make sure I get the

24 distinction correct.

25     MR. GORDON:  Your Honor, I think Mr. Coco would like

1  to address that issue.

2        MR. COCO:  Yes, good morning, Your Honor.

3        THE COURT:  Good morning.

4        MR. COCO:  Nathan Coco from the Mintz Levin law firm

5  on behalf of UMB Bank as indenture trustee.

6        Your Honor, I'm going to try to address the Court's

7  question in this way.  You know, I think all parties agree and

8  Mr. Shandler's testimony demonstrates that the Series 2018A-1

9  and A-2 bonds are fully secured.  And based on the valuation

10 testimony from Mr. Shandler, the Series 2018B bonds are at

11 least partially secured, but not fully secured.  And, you know,

12 the term, you know, allowed secured claim is used in

13 conjunction with, you know, I guess the treatment and

14 description of the Series 2018A-1 and A-2 bonds and maybe that

15 term is even used in certain places with respect to the 2018B

16 bonds.

17       But the term secured claim is separately defined

18 under the plan to adopt the rubric of Section 506(a), which

19 says that a claim is an allowed secured claim to the extent of

20 the value of the collateral supporting that claim.  And so,

21 that's the way that we read the plan, even though it may

22 discuss terms as being secured claims, you know.

23       That was before there was valuation testimony or any

24 ruling on that testimony, and so, you know, perhaps there was

25 no way of knowing for certain the extent to which a claim was

1 partially secured, fully secured, or unsecured.  And so the

2 plan was sort of written in a modular fashion to capture, you

3 know, whatever result we got from this proceeding.

4          THE COURT:  Okay.  I appreciate what you're saying.

5          Okay.  Let me ask.  I have a -- let me just make sure

6 no one has any comments on the plan or the proposed form of

7 order this morning.  I do have a couple of comments on the

8 proposed form of order that I'd like to address before ruling,

9 if we could.

10          First of all --

11          MR. GORDON:  Certainly, Your Honor.

12          THE COURT:  -- let me just state on the record, I do

13 appreciate the debtors working with the Office of the United

14 States Trustee to address certain plan modifications, including

15 the definition of exculpated parties.  I appreciate that the

16 parties make an effort before presentation to the Court.

17          With respect to the form of order, I have a few

18 comments, including, okay, on Page 3, Paragraph C, it addresses

19 judicial notice.  The Court has no issue taking judicial notice

20 of the docket, but not all the documents filed in this case are

21 considered evidence for confirmation so that I would ask that

22 you strike the language in the parenthetical that states "(and

23 deems admitted into evidence for purposes of confirmation),"

24 that that language be stricken.

25          On Page 6 at Paragraph I, and this also applies to

1  the confirmation order at Paragraph 3.  It concerns

2  modification of the plan and the confirmation order.  And I was

3  just curious what are plan modifications contained in the

4  confirmation order?  Are there any?

5          MR. GORDON:  Your Honor, I don't believe there are.

6          THE COURT:  Okay.

7          MR. GORDON:  Unless Ms. Katona corrects me.

8          THE COURT:  I didn't think there were, but I just

9  want to make sure.

10          MS. KATONA:  There are not, Your Honor.  We just

11  wanted to capture -- in the event that there was anything from

12  the outcome of today's hearing wanted to ensure it could be

13  captured.

14          THE COURT:  Okay.  That's fine.  I just wanted to

15  make sure I wasn't missing anything.

16          With respect to Page 7, Paragraph K, on substantive

17  consolidation, I was going to request a modification clarifying

18  the scope of substantive consolidation with respect to the

19  Court's finding.  But I see that this has been addressed in

20  this morning's revised order, so I appreciate that revision.

21          With respect to Page 11, Paragraph 11, which is the

22  distribution of sale proceeds, is this provision necessary?

23  Isn't this duplicative of the sale order that was previously

24  entered by the Court?

25          MR. GORDON:  It is, Your Honor.

1         THE COURT:  I'm not opposed to it.  I just don't

2  appreciate why it's in here.

3         MR. GORDON:  It's sort of a belt-and-suspenders

4  approach.

5         THE COURT:  Okay.

6         MR. GORDON:  It is duplicative of what was in the

7  sale order.

8         THE COURT:  Okay.  That's fine.  I just wanted to

9  make sure I wasn't missing anything with respect to the sale.

10         And on Page 12 at Paragraph 13, this is approval of

11  the restructuring transaction.  As I previously mentioned, the

12  Court isn't approving the 2022 bond documents, so that

13  language, that phrase should be stricken.

14         MR. GORDON:  Understood, Your Honor.

15         THE COURT:  Okay.

16         With that, I'm satisfied, based on the record before

17  me, that the debtors' modified third amended plan at Docket 315

18  satisfies the confirmation requirements of Bankruptcy

19  Code 1129.  In terms of meeting the standard for confirmation,

20  the debtors have admitted into evidence the declaration of Todd

21  Topliff at Docket 318 [*sic*], which is not controverted and

22  supports confirmation of the plan.  The declaration addresses,

23  among other things, the plan treatment, solicitation, and

24  compliance with Sections 1129, 1122, and 1123 of the Bankruptcy

25  Code.

1          The balloting declaration at Docket 314 explains that

2  the debtors have satisfied the provisions of Section 1126 of

3  the Bankruptcy Code with respect to solicitation and voting.

4          The debtors filed a memorandum of law in support of

5  confirmation of the plan.  And although that memorandum is not

6  evidence, it is part of the record before the Court and

7  explains how the debtors have satisfied their burden and the

8  applicable statutory standards.

9          The evidence here today constitutes a *prima facie*

10 showing that the plan does not discriminate unfairly and is

11 fair and equitable with respect to Class 6, which is the only

12 class to vote to reject the plan.  No party in interest has

13 rebutted this showing or otherwise objected to the plan.

14         Furthermore, the testimony here of Mr. Shade [*sic*]

15 confirms that the treatment of Class 6 accords with the

16 2018 trust indenture's allocation of risk reflected in the

17 scheme of payment priority among the series, and is likely a

18 higher recovery than what holders in Class 6 would have

19 received in a Chapter 7 liquidation based on the unrebutted

20 liquidation analysis.

21         In addition, based on the uncontroverted evidence, as

22 well as the lack of objection, I find that cause exists to

23 waive the stay of the confirmation order so that the

24 confirmation order will be effective immediately upon its

25 entry.  I will enter a revised proposed order with the

1  modifications that we've discussed here on the record.  I'd ask

2  Counsel to please submit the revised order under certification

3  with a clean and blackline copy of the order.

4            Are there any questions?

5            MR. GORDON:  Not from the debtors, Your Honor.

6            THE COURT:  Okay.  Is there --

7            MR. GORDON:  Oh, I see Ms. Katona about to open her

8  mouth.  Hold on.

9            MS. KATONA:  No.  Your Honor, we just had one

10 additional.  We filed a revised proposed form of order this

11 morning.  One edit that did not make it into your copy, Your

12 Honor, is at Paragraph 14, Page 12.  It's the same -- we

13 carried through the deemed substantive consolidation language

14 into that finding paragraph as well.  That was not in the red

15 line order that was filed, but we will reflect in the further

16 revised order that edit.

17           THE COURT:  Oh, I see.  Well, that -- so I went right

18 over that.  Yeah, that last line of that paragraph needs to

19 address the consolidation with respect to claim and

20 distribution purposes.  Yes, thank you for pointing that out to

21 me.

22           Is there anything further this morning?

23           MR. GORDON:  No, Your Honor.

24           MS. KATONA:  There is not from the debtors.

25           THE COURT:  Okay.  Well, thank you all for your very

43

1 helpful presentation, including the testimony that was

2 presented this morning.  I will look forward to entering your

3 order today, and I hope you all have a great afternoon.

4           We stand adjourned.

5           MR. GORDON:  Thank you, Your Honor.

6           MS. KATONA:  Thank you.

7       (Proceedings concluded at 11:58 a.m.)

8                        * * * * *

9                **C E R T I F I C A T I O N**

10          I, KAREN K. WATSON, court approved transcriber,

11 certify that the foregoing is a correct transcript from the

12 official electronic sound recording of the proceedings in the

13 above-entitled matter, and to the best of my ability.

14

15 /s/ Karen K. Watson

16 KAREN K. WATSON, AAERT CET-1039

17 RELIABLE                        DATE:  May 2, 2022

18

19

20

21

22

23

24

25